# THE STATE v. HOMER EVANS, Appellant.

**In Banc, March 1, 1916.**

1. **REMARKS OF COUNSEL: Preserved for Review.** Where defendant's counsel, in his objection to argument made to the jury by the State's counsel, repeats the statement made by said counsel and states his reason therefor, and the court by his ruling, accepts the repetition as a true reiteration of what had been said, the ruling, being excepted to, is for review on appeal, without any further preservation in the bill of exceptions than the statement and objection of appellant's counsel and the ruling and remarks of the court, and the exception.

2. ————: **Weak Evidence.** Argument of counsel to the jury, assigned as prejudicial to appellant, is to be examined in the light of the facts of the particlular case. Where the evidence of defendant's guilt is weak, the offense charged is one which decent men abhor, and there is no testimony pertaining to a fact which reasonable men would expect to be developed, remarks of counsel for the State, either in their opening statement or in their argument to the jury, by which such lacking testimony is attempted to be supplied, may alone constitute reversible error.

3. ————: **Seduction: No Request for Fulfillment of Promise to Marry: Supplied by Attorney.** The fact that, after prosecutrix discovered her pregnancy as the result of an admitted sexual relationship, she frequently kept company with defendant in the presence of her and his relatives and requested him to marry her to shield her from its consequences, but at no time suggested or claimed a reparation on account of a promise to marry, there being no legal impediment or other obstacle in the way of such a marriage, tends to impeach her testimony that there had been such a promise, and in view of her unsatisfactory testimony. as to the fact of an engagement was a matter of grave importance for the jury in determining whether or not her testimony was true; and remarks made by the State's counsel, in his opening statement that "the young girl who was wronged by this young man has solicited and begged and importuned him to marry her and give this bright little baby a father and a name," and repeated in substance in the argument to the jury, the effect being, whether intended or not, to break the force of the significant omission, and to supply the lack of it, were reversible error.

*Held,* by REVELLE, J., dissenting, that it is but common knowledge and ordinary human experience that no juror will sit

through a trial of a seduction case without the thought that the girl, whose shame and disgrace would be lessened by marriage, was anxious to and did what she could to bring about the marriage, and the statement of counsel could only have hastened the thought; and, in this case, it was not prejudicial, because the jury knew the defendant had not married her, and counsel's statement that she begged him to do so and his refusal, if effective at all, tended only to corroborate his testimony that he had never promised to marry her at any time.

4. **SEDUCTION:** Evidence: Conclusions and Opinions.    In a prosecution for seduction under promise of marriage, the father of prosecutrix should not be permitted to state his conclusions and give his opinions as to the relations between her and defendant, such as, "He treated her like a sweetheart," "He seemed to think a good deal of her."

Held, by REVELLE, J., dissenting, that the testimony was not reversible error, since the father's knowledge and information upon which the conclusions were based were completely developed, and the jury were fully capable of determining whether or not the conclusions expressed were warranted.

5. ————: ————: ————: **Estimates of Others.**    A voluntary conclusion of prosecutrix's father, drawn from a conversation with some neighbors of defendant, that "from the way they talked about him they had no use for him," is not competent evidence.

Held, by REVELLE, J., dissenting, that, as the statement came out in connection with his explanation of certain matters concerning which he had been interrogated on cross-examination and no motion was made to strike it out, the trial court cannot be convicted of error.

6. ————: ————: ————: ————: **No Motion to Strike Out.** The usual rule is that a motion to strike out is prerequisite to a review of a conclusion voluntarily injected into the case by a witness; but where the trial court, upon an objection being made, ruled on the point on its merits, without such motion, the point is thereby preserved for review on appeal.

Held, by REVELLE, J., dissenting, that the trial court, on an objection being made by simply directing attorneys to "go ahead" did not rule on the merits, and it cannot be anticipated what his ruling would have been had a motion to strike out been made.

7. ————: **Remarks of Court: No Objection.**    Unless there is an objection directed to an objectionable remark made by the trial court, it cannot be reviewed on appeal.

8. ————: **Admission of Promise: Corroboration.** The promise of marriage must precede seduction; and while testimony of a witness that defendant, eight months after the alleged seduction, admitted that "he did promise to marry" prosecutrix, is competent and is evidence upon which an instruction on corroboration may be based, if the admission refers to a time preceding the alleged seduction, it is neither corroboration nor admissible if the admission fixes no time when the promise was made.

9. **INSTRUCTION: Weight to Be Given Defendant's Testimony:** *Held,* by BLAIR, J., with whom WOODSON, C. J., and GRAVES, J., concur, that, where the usual general instruction pertaining to the credibility of witnesses is given, it is error to give the usual cautionary instruction as to the weight and credibility to be given to defendant's testimony, telling them, among other things, to take into consideration the fact that he is the defendant and on trial, for several reasons: *first,* it is a palpable comment on the evidence; *second,* it is violative of the principle that the mere fact that defendant is charged with a crime is no evidence of his guilt; *third,* similar instructions have always been adjudged erroneous in civil cases, and for the reason that liberty or life is more valuable than property, it should be likewise held to be prejudicial in a prosecution for a crime; *fourth,* the statute (Sec. 5242, R. S. 1909) which is supposed to authorize it and which provides that when defendant offers himself as a witness, the fact that he is the defendant "may be shown for the purpose of affecting the credibility of such witness," merely lays down a rule of evidence and cannot be regarded as justifying the giving of an instruction which specifically singles out and designates the credence to be given any particular one among those the statute renders competent as witnesses; and, *fifth,* while there may be cases, such as upon a plea of guilty, in which such an instruction may be considered harmless, in most cases, especially where the State's case upon material issues is inherently weak, it does harm to give it. *Held,* by REVELLE, J., that, while the instruction should never be given, it does not constitute reversible error where there is, as in this case, no doubt of defendant's guilt. *Held,* by FARIS, J., dissenting, that, while conceding some of the reasons given for the impropriety of the instruction to be sound, and that the giving of it subserves no useful purpose, it is nevertheless buttressed by a solemn statute (Sec. 5242, R. S. 1909) and has for more than forty years been held not to be reversible error, and to now hold it to be such would (1) cause much uncertainty in the law, and (2) if it is to be eliminated that should be done by the Legislature; and (3) the instruction but expresses the law as declared by the statute, and it cannot of itself be reversible error to tell the jury by an instruction what the law is.

Appeal from Buchanan Circuit Court.—*Hon. Thomas F. Ryan*, Judge.

REVERSED AND REMANDED.

*G. L. Zwick* for appellant.

(1) The court erred in submitting the case to the jury and in failing to instruct the jury to find the defendant not guilty, which instruction was asked by defendant at the close of the State's case, because the evidence was not sufficient to establish the contract of marriage. State v. Heed, 57 Mo. 252; State v. Reeves, 97 Mo. 668; State v. Eckler, 106 Mo. 593; State v. Long, 238 Mo. 393; State v. Bruton, 253 Mo. 361. (2) The court erred in failing to fully cover all the law in the case in the instructions given for that the evidence of the defense as to previous acts of intercourse was entirely ignored. Clemons v. Seba, 131 Mo. App. 378; State v. Patterson, 88 Mo. 93; State v. Wheeler, 94 Mo. 252; State v. Fogg, 206 Mo. 712; State v. Long, 257 Mo. 225; Staples v. State, 175 S. W. (Tex.) 1056; Humphrey v. State, 143 S. W. (Tex.) 641. (3) The court erred in permitting the prosecuting attorney to make improper and prejudicial remarks in his opening address to the jury as to defendant's failure and refusal to marry prosecutrix after the alleged seduction and in allowing him to repeat such remarks during the argument at the close of the case. 35 Cyc. 1335; State v. Spivey, 191 Mo. 112; State v. Bobbst, 131 Mo. 338; State v. Upton, 130 Mo. App. 316; State v. Graves, 95 Mo. 510; State v. Leaver, 171 Mo. App. 376; State v. Wellman, 253 Mo. 302; State v. Schneiders, 259 Mo. 330; Cook v. People, 2 Thompson & C. 404; State v. Good, 46 Mo. App. 515; State v. Webb, 254 Mo. 434; State v. Hyde, 234 Mo. 256; State v. Clancy, 225 Mo. 654; State v. Elmer, 115 Mo. 401; State v. Fischer, 124 Mo. 464; State v. Ulrich, 110 Mo. 365; State v. Young,

99 Mo. 666; State v. Jackson, 95 Mo. 623.   (4)   In-
struction number 2 should have required the jury to
find that prosecutrix was of previous chaste character;
or, at least, that she was honestly pursuing the path
of virtue at the time instead of merely that she was
"of good repute."   State v. Howard, 175 S. W. 58;
State v. Wheeler, 94 Mo. 252; State v. Marshall, 137
Mo. 467; People v. Weinstock, 140 N. Y. S. 453; State
v. Primm, 98 Mo. 368.   (5) Instruction number 3 is
erroneous in not attempting to define what is meant
by "corroboration," and, further, in being a comment
upon the evidence by suggesting that defendant had
admitted to other parties that he was engaged to prose-
cutrix, when there was no evidence of such an admis-
sion.   State v. Reeves, 97 Mo. 674; State v. Chyo
Chiagk, 92 Mo. 416.   (6) The court erred in admitting
incompetent, irrelevant and immaterial testimony
offered on the part of the State and objected to by de-
fendant.

*John T. Barker*, Attorney-General, and *Lewis H.
Cook* for the State.

(1)   The trial judge followed the approved in-
structions in the case of State v. Meals, 184 Mo. 244.
The court did not fail to instruct the jury as to the
meaning of corroborative evidence and the weight of
corroborative evidence required under the law in cases
of this character.   State v. Meals, 184 Mo. 244; State
v. Fogg, 206 Mo. 696.   Instruction number 2, while it
does not specifically tell the jury that previous acts
of intercourse on part of prosecutrix with other per-
sons would entitle the defendant to an acquittal, yet
requires the jury to find prosecutrix of good repute
in the neighborhood, and that is all that is required by
the law and that is the only issue raised by the statute.
State v. Walker, 232 Mo. 252.   (2)   Samuel Jeffries
stated that the defendant "seemed to treat her as his

sweetheart and seemed to think lots of her,'' and at another point in his testimony stated ''she didn't seem to care for anyone else,'' ''she didn't seem to care for any other company and didn't go with anyone else.'' These utterances were made in connection with a detailed statement by him of the actions of prosecutrix and defendant, and while it may be that such statements were mere conclusions of the witness, yet when made in connection with a detailed statement of the actions of the parties showing upon what he based his conclusion, they could not have been prejudicial to the defendant. Hunter v. Briggs, 254 Mo. 28; Lee v. Lee, 258 Mo. 612. (3) The court should not have sustained the demurrer to the evidence offered at the close of the State's testimony, assigning as a reason therefor that there was no corroborative evidence of the engagement of marriage or promise of marriage as testified to by prosecutrix. State v. Long, 257 Mo. 199; State v. Sublett, 191 Mo. 163; State v. Salts, 263 Mo. 304. (4) Defendant complains that the court erred in the argument of the case when he permitted Mr. Sherman, the assistant prosecuting attorney, over the objection of the defendant, to argue before the jury that the prosecuting witness begged him to marry her. Those remarks were not preserved in the record, and if ever made, are not before this court. Mr. Sherman's remarks were not preserved, nor were they later proved in a manner that would place them properly in the record. It is true defendant's attorney made affidavit that such remarks were made, and the State's attorney also made an affidavit concerning said remarks, but such affidavits prove nothing. They accompany this bill of exceptions but are not a part thereof. This assignment of error, therefore, is not bottomed on anything that appears in the record; hence, on this point, there is nothing before the court for review. State v. Feeley, 194 Mo. 315; State v. McAfee, 148

Mo. 380; State v. Feeley, 194 Mo. 740; State v. Valle, 196 Mo. 34. In his opening statement the assistant prosecuting attorney told the jury that prosecutrix, after her conception, had begged the defendant to marry her. There was no evidence offered to prove the specific statements complained of. Were such remarks proper? If they were not proper, were they prejudicial? We have been unable to find a case in which the propriety of such remarks has been decided, and we therefore can only leave the question to this court. This court has been loath to reverse judgments on account of improper remarks of attorneys in the argument when the proof is clear, for the reason that in such cases a verdict of guilty would have been returned regardless of the improper remarks. State v. Dietz, 235 Mo. 332; State v. Harvey, 214 Mo. 403; State v. Church, 199 Mo. 605; State v. Hibler, 149 Mo. 478; State v. Summar, 143 Mo. 220; State v. Levy, 262 Mo. 193. "If the case was a close one, and the conviction rested upon testimony that was unsatisfactory, we might consider this point as worthy of serious consideration, for as we said in the cases of State v. Hess, 240 Mo. 160; State v. Horton, 247 Mo. 657; and State v. Baker, 246 Mo. 376, the misconduct of a public prosecutor will be weighed in connection with the facts of each case, and when the State's case is weak it will require less misconduct on the part of the prosecutor to work a reversal than where, as in this case, the evidence of defendant's guilt is very strong." State v. Helton, 255 Mo. 183. Courts of other jurisdiction have recognized that a misstatement of the evidence in the opening statement by the State's attorney is not as serious and as prejudicial to the defendant's rights as improper remarks in the closing argument. People v. Bleason, 127 Cal. 323; Reynolds v. State, 147 Ind. 3; State v. Todd, 110 Iowa, 631; State v. Carins, 124 Mich.

616; People v. Milks, 55 N. Y. App. Div. 372; People v. Chalmers, 5 Utah, 201; 12 Cyc. 568.

BLAIR, J.—In the circuit court of Buchanan County, Homer Evans was convicted of seducing Ruby Jeffries under promise of marriage, sentenced to three years in the penitentiary, and has appealed. Prosecutrix fixes the date of the first illicit act as November 24, 1912, and testifies the only other instance of the kind was upon December 14 of the same year. She was born November 6, 1892, and is one year younger than appellant. She lived with her parents, and, a quarter of a mile away, appellant lived with his sisters and widowed mother, near Saxton, Missouri. The two were reared thus near each other and attended the same public school for some time. Prosecutrix at the age of sixteen or seventeen began to attend the high school at St. Joseph, six miles from her home, and boarded there with her aunt. She attended school at St. Joseph three years.

There is no direct evidence tending to corroborate prosecutrix as to a promise of marriage, and she, herself, does not testify to a formal proposal of marriage and a like acceptance by her. She testified she attended school with appellant and "always went with him," but was not allowed to "keep company with him" until she was eighteen, which was November 6, 1910; that while she was in school in St. Joseph, appellant worked there and would meet her at the train when she came from home, and that he took her to church sometimes, but that she was not allowed to go to any other places because she was in school; that in 1910, at appellant's request, she promised to "go with him after she was eighteen" and "go with no one else" except when her father and mother wanted her to do so, "only when it was necessary." She testified concerning appellant, that "when we were going to school,

he said we would be married some day and how nice it would be when I was old enough, and we would not be married now, but go together and have a good time, for when we were married we would have to settle down and think of something else." This last was prior to 1910. As to what occurred upon the occasion on which she, on the trial, testified they became engaged in August, 1911, she said: "In August, 1911, we had gone to church at Walnut Grove and coming home he was telling me, you should consider yourself engaged now, and not go with anyone else, and I promised him I would not go with anyone else if I could avoid it. I never went with anyone else only when it was necessary. So we were engaged the first Sunday in August, 1911," and, she continued, "so we went together all the time," and she follows this by testimony that appellant began to make improper advances in August, 1912, assuring her "it was no harm" and that they "would get married if anything happened." She testifies she repulsed appellant, but the next day he approached her again, and after that broached the matter every time she was with him. On being further questioned for the State, she said appellant argued there was no impropriety in what he asked, since they were to be married, and said that "if anything happened" they would be married right away, otherwise they would put it off until they "were better fixed." Upon November 24, 1912, she accompanied appellant to a place near St. Joseph and for a time occupied a room with him and submitted to his desires. She testifies she protested vehemently against going to the place and against the act itself, but also testifies she aided appellant in removing her clothing, corset and shoes, preparatory to the illicit act. She testified at the preliminary that she attended to these details herself, but says she was nervous then and was mistaken, to the extent indicated. She says that appellant on this

occasion made the same arguments he had unsuccessfully employed before, as above set forth. Of the visit to the same place on December 14, 1912, she says appellant "made her go" despite her strong opposition; that she then told him she would never go to town with him again, and that she never did so.

On the preliminary examination in August, 1913, prosecutrix testified the engagement to marry was entered into after wheat harvest and about threshing time in 1912, but before November 24, 1912. On the trial she attributed this discrepancy to the same cause she assigned for that mentioned above.

On cross-examination she testified she told no one of her engagement to marry appellant and knew of no one appellant had told; that appellant did not ask her parents for her hand, and that she did not tell them of her engagement because she "was afraid to;" that appellant gave her no engagement ring, but that he offered to procure one, which offer she says she declined because she feared her parents, if they saw the ring, would put an end to her association with appellant.

To bring out the relation between the two she was asked how often appellant was at her home after she became eighteen and prior to the date on which she testified her ruin was accomplished, November 24, 1912. To this she replied: "Two or three times a week and maybe more. He would come up and play cards with us, and croquet, and sometimes he took lunch with us, and whenever I had company I always invited him.

"Q. How frequently were you together? A. I saw him almost every day. Q. At those times what would be the train of his conversation about your relations with each other? A. He would tell me how he loved me. (Objection.) Q. State what passed between you and defendant at these meetings. A. He

would tell me how nice it would be when we got married and how much he thought of me and how much I thought of him.''

She admitted going out in company with other young men several times after August, 1911, and during October, November and December, 1912, and that she broke a social engagement with another young man in order to accompany appellant to St. Joseph on the occasion of the second visit to ''Alex's,'' December 14, 1912.

The father of prosecutrix testified, in effect, that appellant's attentions to his daughter began in 1910 or 1911, but added that appellant had ''always gone with'' her since the two went to school together. He was permitted to state that appellant treated prosecutrix ''like a sweetheart'' and that ''he seemed to think a lot of her.'' He testified he saw the two in each others' company ''two or three times a week or more'' at his home, adding: ''If she had company from the city, or anywhere, she would invite him over.'' He said appellant would take prosecutrix out in his buggy or automobile ''to different places and down to his sister's;'' that prosecutrix ''did not seem to care for any other company and wouldn't go with any one else;'' that ''she would turn everybody down for him. It didn't please me, but I seen she thought so much of him and thought I would have to let her have her own way about it.''

One other witness, who lived in the vicinity of Saxton, testified she ''believed . . . if she remembered right,'' that appellant escorted prosecutrix to a party at witness's home ''one evening.'' When this occurred does not appear.

The mother, brother and grandfather of prosecutrix testified in the case, but none of them testified or attempted to testify to any circumstance tending to show that the relations between appellant and prose-

cutrix indicated an engagement to marry. The same thing is true of the numerous other witnesses from the neighborhood who testified in the case.

There is no pretense any date for a wedding was ever set or that any preparations, of any kind, were ever made by prosecutrix or her family, such as usually indicate an approaching wedding. There was no evidence of any gifts of any kind made by one to the other.

The State offered in evidence a card which prosecutrix testified she received through the mail. It is a postal card, mailed some time in 1909. On one side appears the then address of prosecutrix, in St. Joseph, where she was in school, and the initials "H. L. E." Prosecutrix testified the hand writing was that of appellant. The other side of the card bears a picture of a gentleman mailing a card or letter and, in one corner, the printed words, "To My Wife." This card was received by prosecutrix three years before the time the alleged seduction occurred and nearly two years prior to August, 1911, the date she became engaged to appellant, according to her testimony.

In this connection, however, prosecutrix was asked whether she and appellant were engaged when she received the card. An objection was made, and then she was asked to state "what understanding, if any," she had with defendant at the time she received the card. She answered: "When I was going to school he told me not to go with any one else and that we intended to be married, and that when I was eighteen we would be engaged. I was eighteen in 1910 (November 6th). We had always thought lots of one another and we always talked about when we got old enough to go together." On cross-examination prosecutrix testified she received the card in 1909, but was not engaged to appellant until August, 1911. Appellant denied addressing or mailing the card, and said

it was done by a kinsman who placed his (appellant's) initials on it as a joke. No other card and no letters or other writings of any sort, sent or received by appellant, were offered or mentioned in evidence.

One Helsel testified he knew and lived near the principals, and that, after gossip had gotten well under way, about the 1st of August, 1913, he jestingly asked appellant "how his boy was;" that appellant said "all right," and asked witness "what would you do if you were in my place?" Witness said he replied: "I would have married the girl or got so far away nobody would ever see me." He says appellant then "said he did promise to marry her and would have, but R. T. [Moddrell] and Tadlock told him not to." Helsel testified appellant did not say when the promise alluded to was made.

Five witnesses testified prosecutrix bore a good reputation prior to the time she charges she was seduced.

She did not advise her parents of her condition until about July 1, 1913, six or seven weeks before the birth of her child. Her father testified he was sick when the information reached him and that he sent for appellant, but appellant did not come. On ruling on an objection to this statement, the trial court said it was competent for the State to show witness sent for appellant and that appellant *refused to go to see him.* There was no evidence how Jeffries' message was sent or what it was, and none that it ever reached appellant. Prosecutrix testified she told appellant of her condition on March 8, 1913. She also testified appellant, in May, 1913, solicited her to go again with him to "Alex's," but that she refused. On neither of these occasions does she claim she reminded appellant of a promise to marry her, nor does she testify she ever did so. The father was also asked concerning a conversation he had with some ladies whom he visited while

looking up witnesses. He was asked about what they said about a specified matter affecting appellant, and he answered the question and then added: "From the way they talked about him they had no use for him," the reference being to appellant. The court, on objection being made to this that it was a conclusion, ruled it was competent, saying: "He is stating what she said, not what he said," and directed counsel for the State to "go ahead," which counsel did by asking witness whether that "was the substance of all the conversation that took place," to which the witness replied affirmatively.

Appellant testified in his own behalf. He denied there was ever any promise of marriage; stated that in October, 1912, he was told by R. T. Moddrell that he had had sexual intercourse with prosecutrix on the way home that night from a dance at the Adams' home near Saxton; that subsequently, he, appellant, broached this circumstance to prosecutrix, and that the ensuing conversation resulted in the trip to "Alex's," the place prosecutrix says appellant took her November 24, 1912; that he experienced no difficulty in securing the consent of prosecutrix to the sexual act; and that they visited the same place again December 14, 1912, as testified to by prosecutrix. He also testified prosecutrix never at any time asked him to marry her after she discovered her condition, and he denied telling Helsel he had ever promised to marry prosecutrix. He testified he had taken prosecutrix "to town and automobile riding" and to the homes of the best families in the country about Saxton, and had escorted her to parties and had visited in the Jeffries' home and "had meals there when they had company," and that prosecutrix visited his mother and sisters at their home, and that he and she and his mother and sisters attended gatherings together after December, 1912. In this he is corroborated by prosecutrix. He denied having said in August, 1912, that he had attempted to

seduce prosecutrix, but had failed. He was contra-
dicted as to this by one witness.

R. T. Moddrell and Winston Tadlock, young men
living in the Saxton neighborhood, cousin and second
cousin, respectively, of appellant, both testified they
had been intimate with prosecutrix. Moddrell testi-
fied to one instance, and Tadlock to a number of them.
As to their being in the company of prosecutrix on the
occasions they named, Moddrell was corroborated by
prosecutrix and other witnesses, and Tadlock was cor-
roborated by prosecutrix as to some of the occasions
and contradicted as to the rest. Prosecutrix strongly
denied any improper relations with either of them or
any other person except appellant. Moddrell testified
he told appellant in October, 1912, of his experience
with prosecutrix. There was testimony that both
Moddrell and Tadlock had made statements out of
court inconsistent with material portions of their tes-
timony on the trial, and there were some inconsisten-
cies in their testimony as given in the case. There was
evidence tending to show Tadlock's reputation for
truth, veracity and morality was bad, that as to the
last mentioned quality being slight. There was as
much testimony that his reputation was good. It
appeared in evidence that Moddrell and Tadlock had
taken considerable interest in appellant's behalf, and
had each made an affidavit, for the use of the prose-
cuting attorney, stating their illicit relations with
prosecutrix. There was evidence they had been led
to believe this would result in a dismissal of the prose-
cution. Some inconsistencies between Tadlock's testi-
mony and his affidavit were called to his attention, and
he made explanations which had a tendency to har-
monize them.

There was evidence tending to prove circum-
stances having a strong tendency to show that prose-
cutrix had been guilty of unchastity with one Opp-
linger in October, 1912. This individual was visiting

267 Mo. 12

in Saxton at the time, but lived in another State. As to the opportunity, the facts are indisputable. The testimony as to the circumstance which would practically convict prosecutrix outright was that of Moddrell.

George Thompson testified that in the summer or fall of 1912 he came upon prosecutrix, in the dusk of evening, in a compromising position near the roadside with a young man who was unknown to him. He was unable to describe the stranger, except as to size, and testified he had never seen him before and had not seen him since. He declared prosecutrix and her companion did not seem abashed but "grinned" at him. Prosecutrix denied all this.

There was some evidence that prosecutrix indulged in vulgar language and in unmaidenly conduct in the presence of men. This was chiefly supported by Tadlock's testimony.

Evidence tending to show prosecutrix, during the fall of 1912, went to various places with others than appellant was offered. Four or five young men figured on her social calendar, to some extent, during this time.

Appellant's mother testified that after the condition of prosecutrix was discovered by her parents and the talk began, she, the witness, was sent for by them and went to the Jeffries home and was there informed of the matter and, among other things, she asked prosecutrix in the presence of her parents, whether appellant promised to marry her, and that prosecutrix answered he had not; that then she asked prosecutrix "why she did it," and prosecutrix replied she "didn't know;" that the following morning prosecutrix and her mother came to the home of witness and in the conversation she asked the same questions and received the same answers. As to this second conversation she was corroborated by one of her daughters and by appellant, and was contradicted as to both occasions by prosecutrix and her mother, though not as to

the fact that there were conversations at the times mentioned and not as to their presence. The father of prosecutrix also contradicted the witness as to the first conversation. There was no testimony, however, that prosecutrix claimed a promise of marriage on these occasions. Her mother testified prosecutrix wept, but said nothing at all.

In his opening statement counsel for the State, over appellant's objections, was permitted to say: "The young girl who was wronged by this young man has solicited him and begged him and importuned him . . . (Objections) . . . has begged him to marry her . . . to give this bright little baby a father and a name. We will show that he has at all times and still refuses to become the husband of this little girl that he has wronged, and the father of this little baby that he has brought into the world."

During the argument to the jury by counsel for the State, appellant's counsel said: "I object to the statement that this girl begged the defendant to marry her; there is no testimony that she ever said anything except on the eighth day of March to him on the subject." The court said the jury was capable of determining which of counsel was correct, and then told the jury to decide the case from the testimony, not from the argument.

I. Appellant contends it was error to permit counsel for the State, in the opening statement and during the argument to the jury, to make the remarks which appear in the statement of the case. The learned Attorney-General insists that the matter objected to in the argument to the jury at the close of the case cannot be reviewed, for the reason that it was not properly preserved in the bill of exceptions, and that the attempt to preserve it in the affidavits is futile. In so far as the rule is applicable, this contention is correct. It does not cover the

**Remarks of Counsel.**

whole matter, however. During the argument of the case by counsel for the State counsel for appellant made this objection: "I object to the statement that this girl begged the defendant to marry her; there is no testimony that she ever said anything except on the 8th day of March to him on the subject." The court said: "The jury heard the testimony and are capable of deciding which statement is correct, Judge Strop's or yours. Gentlemen of the jury you will decide the case from the testimony as you remember it, and not from the argument of counsel." Defendant excepted. The reiteration in counsel's objection of the language objected to, coupled with the ruling of the court, which, by clear implication, concedes the correctness of the recitation, in the objection, of the argument of counsel for the State sufficiently preserves the argument in so far as it is stated in the objection. This identical question was presented by the briefs in State v. Newcomb, 220 Mo. l. c. 57, and this court nevertheless ruled on the objection to the argument, and rightly so. The record shows the objectionable language was stated by appellant's counsel, as that used by counsel for the State, that the trial court understood it so and ruled on the matter on its merits. This portion of the argument and the portion of the opening statement objected to, as heretofore set out, are before us and will be considered together.

It is settled law that argument of counsel, when objection is made, will be examined in the light of the facts of the particular case.

In State v. Horton, 247 Mo. l. c. 666, BROWN, J., pointed out the reasons why those concerned in prosecutions, particularly of this kind, should perform their duties "with scrupulous fairness;" and in State v. Levy, 262 Mo. l. c. 193, it was said, in considering an opening statement to which objection had been made: "If the case was a very close one, and the conviction rested upon testimony that was unsatisfactory, we

might consider this point as worthy of serious consideration, for as we said" (in cited cases) "the misconduct of a public prosecutor will be weighed in connection with the facts of each case, and when the State's case is weak, it will require less misconduct on the part of the prosecutor to work a reversal than where . . . the evidence of defendant's guilt is very strong."

In State v. Helton, 255 Mo. l. c. 183, it was said: "'Improper arguments are a class of errors unto themselves, and no hard-and-fast rule can be laid down by which their vicious effects shall be measured. When the evidence of guilt is overwhelming and the verdict is not unusually severe, it is difficult to say that the improper remarks produced any harmful effect . . . Quite a different rule arises in cases like the one at bar, where the evidence . . . is meager and unconvincing, and the prosecutor undertakes to secure a conviction by arousing prejudice in the minds of the jury through the use of epithets and other improper argument."

Under the statute (Sec. 4478, R. S. 1909) under which this prosecution was instituted, if appellant had married prosecutrix before the jury was sworn that would have barred his further prosecution; but no offer to marry prosecutrix would have aided him. Evidence of such an offer would not have been admissible even to mitigate the punishment. [State v. O'Keefe, 141 Mo. l. c. 273; State v. Brandenburg, 118 Mo. l. c. 185 et seq.] He could not show he had offered to marry prosecutrix and she had refused him. The fact, however, if it had been a fact, that she demanded of him the fulfillment of the promise under which she testifies her ruin was accomplished would, in view of her professed affection, have placed her before the jury in the light of acting according to the natural instincts of a woman wronged under a promise of marriage. The fact that she did not make any such demand, which appears clearly from this record, is one

of the circumstances tending strongly to impeach her testimony that there was a promise of marriage. In view of the rule announced by the cases cited, a recapitulation of some of the facts is warranted.

Prosecutrix testifies she told appellant of her condition March 8, 1913; that in May, 1913, he solicited her to revisit "Alex's;" that he visited her home, to play cards, after March 8, 1913; that she saw him and was with him, in the company of others, frequently after November 24, 1912, and prior to August, 1913; that she saw him at his home in about July 1, 1913; but she does not testify that on any occasion she ever referred to a promise of marriage in his presence. Her condition was the reason and theme of the conversation between her parents and appellant's mother in June, 1913, as it was of the conversation at appellant's home the following day, and on this last occasion she talked, or had an opportunity to talk with appellant, but she does not pretend she demanded, claimed or suggested reparation on the ground of any promise of marriage. Her mother's testimony is positive she did not do so. Even on the trial she does not testify to an unequivocal promise and a like acceptance by her, and on the preliminary examination her testimony was less satisfactory in this respect. On the trial she contradicted her testimony before the justice of the peace as to the time, place and circumstances of the origin of the engagement she asserted. The first appearance of her claim that a promise of marriage existed seems to have been at the time she commenced this prosecution.

In the light of all the circumstances, her failure to demand of appellant that he keep the promise she testifies he made, was a matter for the grave consideration of the jury. We do not mean to say that a demand of marriage by her was essential to the State's case, but simply that on a record showing the facts stated and indicating a claim of her continued affection and disclosing no obstacle to marriage which would explain

her silence, the failure of prosecutrix to demand of appellant such reparation, as a fulfillment of his alleged promise would have given, is a fact of much importance upon the question of the truth of her testimony.

Whether or not it was the intent, the probable effect of the remarks objected to, was to break the force of this significant omission. The opening statement was inflammatory and argumentative. It was not a simple statement of expected proof to say the State would show prosecutrix "solicited, begged, importuned" appellant to marry her and that he had "refused at all times and still refuses" to marry the "little girl he had wronged" and give a name "to this litle baby he brought into the world." There is absolutely nothing in the evidence offered tending to warrant such a forecast, and it is hardly conceivable counsel for the State could have been ignorant that the testimony of the prosecutrix and her mother would furnish complete refutation of these statements. To follow such an opening statement with an argument to the jury in which the same unfounded declarations were repeated, indicates that, absent evidence on a vital point, counsel supplied the want with repeated and unchecked assertion.

We do not regard as important the fact that the name of one of counsel, as the offender, appears in the record in connection with the closing argument and that of another appears in the motion for new trial. The substance of the matter is that certain argument was objected to, and the objection to the same argument, so far as its substance, and even language, is concerned was preserved in the motion. The course pursued by counsel constituted reversible error.

II. It was error to permit the father of prosecutrix to state his conclusions and give his opinions as to the relations between appellant and prosecutrix. He had stated some facts concerning their association, and it is

Conclusions and Opinions.

suggested this made his opinions competent. Cases involving the issue of mental incapacity are cited. Such decisions are obviously inapplicable. Other dedecisions are placed before us. In Eyerman v. Sheehan, 52 Mo. l. c. 223, the question was the value of certain broken stone in place in a reservoir in the construction of which it had been used. It was shown that accurate measurement was impossible, and witnesses who had been employed in constructing the reservoir and had "ample data upon which to make their estimate" were permitted to give an estimate of the average depth of the broken stone used. The court said: "The general rule is that witnesses must state facts, and not their individual opinions, but there are exceptions . . . When the subject of inquiry is so indefinite and general in its nature as not to be susceptible of direct proof, the opinions of witnesses are admissible. If the witness has had the means of personal observation, and the facts and circumstances upon which he bases this conclusion are incapable of being detailed so intelligently as to enable any one but the observer himself to form an intelligent conclusion from them, he may add his opinion. A witness who is such an expert may state facts and give his estimate of the work upon the facts detailed."

In State v. Ramsey, 82 Mo. l. c. 137, a murder case, it was held that a witness might be permitted to state that the slain man, just after the first interchange of blows, "looked scared" and "looked as if he wanted to get away." The court held the testimony admissible on the authority of Wharton on Crim. Ev., sec. 751, wherein it is said: "Evidence that defendant was confused, embarrassed, or under the influence of terror is receivable."

In State v. Buchler, 103 Mo. l. c. 206, 207, prosecution for felonious assault, it was held proper to admit testimony that the expression on defendant's countenance was "anger, ferocity, vulgar hate." The

court said: "A person of ordinary understanding could not detail facts which would give to a jury the remotest idea of the passions expressed on the countenance, though a child one year old would distinguish anger from love in its mother's face. Witnesses are allowed to testify to their impressions or opinions on such matters, for want of any other way to get the evidence before the jury; they admit of no more definite proof."

This rule is not applicable in this case. Jeffries' statement that appellant *treated* prosecutrix like a sweetheart discloses a mere conclusion from acts of defendant, and it does not appear these are unsusceptible of proof. That appellant "seemed to think a good deal of her" is clearly the inference drawn from observation of acts of appellant. The same is true as to what witness said prosecutrix "seemed to do."

These are conclusions, pure and simple. Manifestly, they do not fall within the rule of the cases from which we have quoted. The testimony was erroneously admitted.

III. Jeffries' conclusion, drawn from the conversation of some ladies to whom he talked before the trial, that "from the way they talked about him" (appellant) "they had no use for him," was not competent evidence. It was volunteered by the witness. No motion to strike out was made, and the usual rule is that, in such circumstances, such a motion is a prerequisite to a review of such matter. In this instance, however, the trial court, on the objection made, ruled on the point on its merits, despite the fact the approved method, by motion to strike out, had not been employed in raising the question. The justification of any method of procedure of this character is found in its results. The rule as to the employment of motions to strike out incompetent testimony volunteered, arises out of the fact such mo-

tions present the point made sharply to the court and draw his attention and ruling to the very matter of which complaint is made. In this instance, the objection served the purpose, called the matter specifically to the court's attention, and elicited a ruling on the point on its merits. We think it preserved the question for review. The testimony was clearly inadmissible.

IV. The admission of the postal card is said to constitute error. Ordinarily, letters, cards and like missives, interchanged by the principals, Prior Writings. are admissible for what they are worth. This card was received by prosecutrix about two years before August, 1911, the date she says she became engaged to appellant, and over three years prior to the date of her downfall. It contains a picture and three printed words. In no event could it be relied upon as corroborative of the promise of marriage, since there was, outside of the testimony of prosecutrix, no foundation laid for its introduction in evidence. [State v. McCaskey, 104 Mo. l. c. 647; State v. Davis, 141 Mo. l. c. 525.] Its worth as evidence of the relations between the parties is practically nothing, because (1) it was received two years before the engagement, and (2) it is inherently weak in character. The rule, ordinarily applied, is stated in State v. Walker, 232 Mo. l. c. 263, 264. However, in view of the circumstances, if this case is retried and the postal card is in evidence and the record made is like this one, the trial court should confine its evidentiary use to questions independent of corroboration of the marriage promise.

V. It cannot be disputed that, in the absence of some showing that the message reached and was understood by appellant, the remark of the trial Remark of Court. judge in ruling on Jeffries' testimony that he sent for appellant was objectionable as assuming, before the jury, that appellant "refused to

go'' to see Jeffries. However, no objection was made to the remark or exception to it saved. The exception saved, we think the record shows, was directed to the ruling as applied to the question preceding the remark. Further, the motion for new trial does not refer to the matter or contain any ground broad enough to include it.

VI. Helsel's testimony was concerning an admission made by appellant, eight months after the alleged seduction, that "he did promise to marry" prosecutrix. Helsel stated appellant did not say when this promise was made. Testimony showing a very similar admission was held sufficient corroboration in State v. Phillips, 185 Mo. l. c. 187, 188. In somewhat similar circumstances, a like rule was approved in State v. Sublett, 191 Mo. l. c. 170, 172, 173. This evidence was undoubtedly sufficient as an admission if it constituted an admission of a promise made prior to the seduction; otherwise, it amounted to nothing. The promise of marriage must precede the seduction. [State v. Eisenhour, 132 Mo. 140.] On the authority of the cases first cited, the testimony was admissible, and, in itself, sufficient corroboration of the marriage promise. Speaking for himself, the writer is of the opinion there is nothing in the language used or in the evidence anywhere upon which a jury could reasonably determine whether the promise said to have been admitted was made before or after the seduction, and that the testimony was inadmissible, and the instruction which indicated corroboration might be found from admissions alone, having in this particular no other support than Helsel's testimony, was in this respect erroneous. In a close case corroboration should be strong, and the rule in State v. Teeter, 239 Mo. l. c. 488, ought to be applied here upon this phase of the case.

*Admission of Promise.*

VII. For the reasons given in State v. Mintz, 245 Mo. l. c. 542 et seq., it was, in the writer's opinion, error to give the instruction, commonly given the jury concerning the weight to be given a defendant's testimony, to take into consideration the fact he was the defendant. In the case cited a somewhat different question was presented, but most of the reasons given there are applicable here. The usual general instruction on the credibility of witnesses was given in this case. That applied to appellant with the rest. The other instruction referred to is such a palpable comment on the weight of the evidence and so clearly violative of the principle that the mere fact defendant is charged with crime is no evidence of his guilt, that it is too obviously erroneous to require discussion. When a few dollars, instead of a man's life or liberty, are involved, this court does not tolerate an instruction of the kind. [Stetzler v. Railroad, 210 Mo. l. c. 713, 714.]

*Weight of Defendant's Testimony: Usual Instruction.*

The decisions dealing specifically with the instruction given in this case, from the time of its first appearance here, State v. Maguire, 69 Mo. 197, until to-day, generally concede, expressly or by implication, that the instruction is not invulnerable, but hold, in a way, that it is harmless. That suggestion finds its complete answer in the reason given for holding erroneous, analogous instructions affecting the testimony of a party in a civil case. It is a plain and unquestionable comment on the weight of defendant's testimony. One reason advanced in support of the instruction is that the statute rendering defendants in criminal cases competent as witnesses (Sec. 5242, R. S. 1909) provides that when a defendant offers himself as a witness, the fact that he is the defendant "may be shown for the purpose of affecting the credibility of such witness." The writer is of the opinion that what is said of this particular suggestion in State v. Mintz,

supra, l. c. 545, furnishes the answer to the argument mentioned. "In truth the statute, so far as now pertinent, merely lays down a rule of evidence and cannot be said to authorize giving a specific instruction as to the credence to be accorded any of those whom it renders competent as witnesses. It has no more of such efficacy than has any other rule admitting impeaching evidence, whether such rule emanates from a legislative or common-law source."

To hold the statute warrants this instruction is to hold that a mere legislative declaration of a rule as to the admission of an impeaching fact as evidence warrants a specific comment on that evidence by instruction to the jury. It is not possible to admit the correctness of this instruction without extending the practice to include all other legislative declarations of similar character, and there is no logical defense for discriminating, in this connection, between rules made by the Legislature and those of like kind which come from any other source. At any rate it could not be denied, if the argument based upon the clause quoted from section 5242, supra, is sound, that reason must require a like effect to be given to that provision in section 6354, Revised Statutes 1909, which renders competent parties to civil actions and expressly provides that the fact one is such a party "may be shown for the purpose of affecting his credibility." Neither does the legislative requirement that the court *shall* instruct the jury, etc., in criminal cases affect the matter. That mandate requires *instructions, on the law of the case, not comments on evidence.* Further, the duty of a court to instruct in a criminal case, "whether requested or not," is no greater than its duty to instruct in a civil case when *requested* to do so. If the argument based upon the command to instruct is sound and warrants the giving the instruction being considered, it must follow that a like instruction must be given as to parties testifying in civil cases when such an instruc-

tion is asked. Consequently, the command of the statute that the court shall instruct the jury in criminal cases in nowise creates any condition which warrants a distinction between the rule, so far as concerns the instruction under consideration, applicable in such cases and that applicable in civil cases.

Possibly there are cases in which no harm is done defendant by giving such an instruction as that being considered. The writer is unable to conceive 'such a case unless the accused pleads guilty. However, assume such a thing can be; in such a case the judgment ought not to be reversed on account of the instruction. This is so manifestly *not* a case of that kind that it needs no argument to show it.

In this case, therefore, it is the opinion of the writer that we should at least hold that in a case like this, in which the State's case is possessed of so much inherent weakness, the instruction is reversible error. Otherwise, we permit the State to supply its lack of convincing evidence by securing from the judge an adverse comment on defendant's testimony, which comment is based upon a practical assumption of the very guilt which is the subject of inquiry.

VIII. On the subject of corroboration, the rules of law are clearly established, and we need not go into a further discussion of the matter.
Corroboration. There is no impropriety in saying, however, that the instructions should be drawn in such manner as to give the appellant full protection in this connection, and that the jury should be cautioned against a finding of corroboration from circumstances as easily referable to some other relationship of the parties as to an existing engagement to marry. [State v. Charles Spears, 183 S. W. 311.] Neither should the instruction leave any doubt the promise relied upon must have been an existing one and that a promise conditioned upon pregnancy resulting would not suffice.

The testimony of prosecutrix warrants an instruction upon this theory. Further, in the circumstances of this case, there should be given an explicit instruction upon the effect of previous illicit relations with other men. [State v. Patterson, 88 Mo. 88.] The correct rule may be reasoned out from the instructions given, but an express statement of it is fairer in a case disclosing the weaknesses apparent in this.

The judgment is reversed and the cause remanded. *Woodson, C. J.,* and *Graves, J.,* concur; *Bond, J.,* concurs in the result; *Faris, J.,* concurs in a separate opinion; *Revelle, J.,* dissents in opinion filed; *Walker, J.,* absent.


FARIS, J. (concurring except in paragraph seven)—I concur in the result of the able opinion of my learned brother Blair in this case, but I cannot consent to characterize the giving of the cautionary instruction as to the weight and credibility of the evidence of defendant as reversible error. So, I dissent to what is said on this question in paragraph 7 of Judge Blair's opinion. I do this because the unsettling of this question would cause much uncertainty and result in the reversal of many cases unnecessarily. Aside from the statute, infra, I concede the logic of his arguments, and admit the existence of a different rule in civil cases. But this question has been settled in this State for almost forty years (State v. Maguire, 69 Mo. l. c. 202, decided in 1878), and as the settlement thereof, as unanimously ruled by Division Two of this court and evidenced by dozens of rulings, *is well buttressed by a solemn statute* (Sec. 5242, R. S. 1909), it ought not to be disturbed. If this ruling is to be disturbed it is plainly the duty of the Legislature to create the disturbance by an amendment to said section 5242. For in view of the fact that such an instruction is comparatively innocuous, since it but tells the jury that they may do the identical thing which they would

do without being told, no sufficient reason would seem to exist for our amending this section by judicial construction.

In the fairly recent case of State v. Shaffer, 253 Mo. l. c. 338, Division Two, discussing this identical question, unanimously said:

"It is also contended by defendant that the court erred in giving instructions numbered 3 and 4, which we have set out in the statement, and which deal with the weight and credibility of the testimony of the defendant and that of defendant's wife. Learned counsel cite us to a very late holding in a civil case, that of Benjamin v. Railroad, 245 Mo. 598, in which suit a similar comment upon the testimony of the plaintiff was held to be error. We have no fault to find with the holding of the court in that case. But learned counsel overlook the fact that the statute itself in conferring upon the defendant and defendant's spouse the right to testify, has seen fit to limit such right by permitting a showing of the fact that the witness is the defendant and on trial, and the fact of marriage to the spouse offered as a witness, for the purpose of affecting the credibility of either or both of them. [Sec. 5242, R. S. 1909.] We have no such statute touching the testimony of a plaintiff in a civil case, or of a defendant in such case; hence the difference between the two holdings. If the statute permits the showing of the fact of interest on account of the witness being a defendant or the spouse of a defendant, why may not the jury be likewise advised of the existence of the law applicable to such status by an appropriate instruction? We concede, however, that there is not much excuse for the giving of such instructions as these where the court instructs generally as to the credibility of witnesses and as to the fact that the interest of any witness or witnesses in the case may be considered by the jury for the purpose of affecting the credibility of such witness. But while these instructions have been

many times given, and while in the view of the writer they ought not to be given, yet when we consider the statute which we cite above, and when we have reference to the many holdings of this court that the giving of instructions such as these do not constitute reversible error, we are not disposed to go farther than to say, as has been many times said before by this court, that in our view the giving of such instructions as these subserves no useful purpose, and would as well be omitted and the labor of preparing the same saved. Similar instructions have been before us in many cases. [State v. Napper, 141 Mo. 1. c. 407; State v. Fox, 148 Mo. 517; State v. Dilts, 191 Mo. 673; State v. McDonough, 232 Mo. 219; State v. Lingle, 128 Mo. 528; State v. Newcomb, 220 Mo. 1. c. 66.] And while the giving thereof has often been criticized as unnecessary, we have not been able to find a single case reversed on account of these instructions.''

Brevity would seem to forbid the addition of anything to what was said on this point in the Shaffer case, supra. But one further apposite thought, suggested by inference but not fully enlarged on in the Shaffer case, thrusts itself to the front here: This point is that trial juries, unlike private citizens, are not governed by the maxim, *ignorantia legis neminem excusat.* In no case, barring slander and libel at least, is a jury presumed to know the law. Both by practice and a plain statute (Sec. 5231, R. S. 1909), trial courts are required in criminal cases to tell, i. e., *instruct,* the jury what the law is. Section 5242 being the law by which the jury must try the case, or to drop into metaphor, being the section which furnishes the legal scales by which in trying the case, the jury are required to weigh the testimony of the defendant, or that of his or her spouse, can there be any legal solecism in telling the jury *that such is the law?* Is not the court *nisi* but performing a statutory duty in doing so? From what other source are they permitted to know, or can they

know, that this is law? So, while adhering to all that Division Two of this court said in the Shaffer case as to the logical non-necessity of the instruction *in cases wherein a general instruction on the credibility of the witnesses is given*, I do not think that the occasion calls for the specific branding of this point as reversible error here or elsewhere. I think it should be left where Division Two has left it, that is, to be gradually worked out by the trial courts, in the light of the criticism directed toward it in the Shaffer case, which is after all but a type of many other similar rulings upon this point. [State v. Shaffer, supra; State v. Hyder, 258 Mo. 225; State v. Newcomb, 220 Mo. l. c. 66; State v. McDonough, 232 Mo. 219; State v. Mintz, 245 Mo. l. c. 547; State v. Dilts, 191 Mo. 673; State v. Fox, 148 Mo. 517; State v. Napper, 141 Mo. l. c. 407; State v. Lingle, 128 Mo. 528; State v. Zorn, 71 Mo. 415; State v. McGinnis, 76 Mo. 326; State v. Cook, 84 Mo. 40; State v. Wisdom, 84 Mo. l. c. 190; State v. Ihrig, 106 Mo. l. c. 270.] Hence, I concur in the result and in the opinion, barring what is said in paragraph seven.

REVELLE, J. (dissenting)—I. In my opinion the only claim to judicial countenance that the cautionary instruction as to the testimony of a defendant can make, is its old age and gray hairs. It is supported by neither logic nor justice, and, like the proverbial wolf, first found its way into our midst in the guise of a harmless and mistaken thing. It frequently has been the subject of criticism but never of commendation, and I agree that it possesses all the frailties and infirmities that our learned brother BLAIR has so clearly pointed out. It is not only a palpable comment on the weight of defendant's testimony, but is predicated upon a principle inconsistent with the presumption of innocence, and car-

*Weight of Defendant's Testimony: Usual Instruction.*

ries with it that very inference. If the indictment is no evidence of guilt, and if the defendant is presumed to be innocent, what justification can there be for instructing that he is guilty to such a degree as to cast suspicion upon his credibility and require his evidence to be received with caution? I have always understood that the presumption of innocence attends an accused throughout the trial, and for all purposes, and this includes the time and manner of giving instructions. To justly attach the suspicion must we not presume his guilt, because there is no room for this poison in the case of the innocent, and it is contrary to human experience to say that the instruction does not have the effect of creating a suspicion whenever and wherever it is given, and suspicion once aroused is hard to down and likely to extend its fangs to all parts. After giving the general instruction on the credibility of witnesses, and the rule by which their testimony is to be weighed, then to single out the defendant, who presumably is equally innocent with the rest, and admonish the jury to *beware* of what he says, is giving entirely too much prominence to the isolated fact which it is said section 5242, Revised Statutes 1909, permits to be proved; and this is all contrary to the uniform holdings of this court. [State v. Heath, 221 Mo. l. c. 592; State v. Edwards, 203 Mo. l. c. 545; McFadin v. Catron, 120 Mo. l. c. 274; Railroad v. Stockyards, 120 Mo. l. c. 565; Jones v. Jones, 57 Mo. l. c. 142; Barr v. Kansas City, 105 Mo. 550.]

In State v. Heath, supra, this court, in discussing a similar proposition, said: "In our opinion this instruction was properly refused. It was nothing more or less than selecting certain isolated facts and undertaking to comment upon them . . . This court has uniformly and repeatedly condemned instructions which undertook to treat of isolated facts which may be developed upon the trial."

In Barr v. Kansas City, supra, l. c. 559, it is said: "The vice of specially calling the attention of the jury to isolated facts or otherwise giving prominence to the facts of the case favorable to one side, while measurably retiring the view of the other side by ignoring it, or presenting it only in general terms, has been frequently condemned by this court. [Sawyer v. Railroad, 37 Mo. l. c. 263; Anderson v. Kincheloe, 30 Mo. l. c. 525; Fine v. Public Schools, 39 Mo. l. c. 67; Rose v. Spies, 44 Mo. l. c. 23; Jones v. Jones, 57 Mo. l. c. 142; Raysdon v. Trumbo, 52 Mo. l. c. 38; Chappell v. Allen, 38 Mo. 213.]" In the same case the court further says: "It is a vicious mode of instruction, trenches upon the province of the jury to weigh all the evidence, without bias or comment from the court."

Besides, the provisions of section 5242, supra, which is said to be responsible for the approval of this instruction, can hardly be said to have any real application to the *person on trial.* This section merely provides that no person shall be incompetent as a witness by reason of being the person on trial, or by reason of being the husband or wife of the accused, but "such fact may be shown for the purpose of affecting the credibility of the witness." In so far as it provides that such "fact may be shown for the purpose of affecting the credibility of witnesses," it can, in its very nature, be applicable only to the husband or wife, as the case may be, of the defendant, and not to the defendant himself, because, without any proof, we know the jury knows the identity of the accused, and when he testifies that he is the person on trial. This they know from the identity of name and things occurring during the proceedings.

The vice of this instruction is clearly apparent in at least certain cases which come before this court. For instance, in cases of rape, we have held that a conviction is warranted on the uncorroborated testi-

mony of a prosecutrix, and while it may be conceded that a *guilty* person on trial has a strong incentive to testify falsely, and that his testimony should be received with caution, we also know that a prosecutrix, in such a case, frequently has an even greater inducement to commit perjury. In such a case where only the prosecutrix testifies to the facts of guilt, and such facts are denied by the defendant, this instruction is usually sufficient to break the scale balance and overcome the presumption of innocence. It casts suspicion upon the defendant and leaves the prosecutrix on a higher and more favorable plane, thus giving greater weight to her testimony.

Notwithstanding the frailties which this instruction possesses, and the somewhat stormy career through which it has passed, trial courts persist in giving it, and it has never yet been held sufficient in this State, to warrant a reversal. While I firmly believe that the instruction should *never* be given, I am of the opinion that there are numerous cases from whose records it appears that the same was not really prejudicial, and, therefore, insufficient to warrant a reversal, but I am further of the opinion that there are many cases where the evidence is so close, and the defendant's guilt so doubtful, or the nature of the trial and conditions such, that the giving of this instruction would change the result, and in such cases the error is of such magnitude that this court *should not hesitate* to hold it ground for reversal.

II. In the instant case I do not agree with the majority opinion as to the disclosures of the record. As I have read it I have no such doubt

——: ——:
**Non-Prejudicial.** of defendant's guilt or the orderly character of the trial as is indicated by the opinion, and am, therefore, unwilling to reverse the judgment because of this instruction.

III. Neither do I agree that the remarks of State's counsel in his opening statement are sufficient to work a reversal, nor do I think that the alleged closing argument is so preserved as to be open to review. It may be conceded that the opening statement was not warranted by either the law or facts, but, in my opinion, it was not prejudicial. It is but common knowledge and ordinary human experience that no juror will sit through the trial of a seduction case without the thought that the girl, whose shame and disgrace would be lessened by marriage, was anxious to and did what she could to bring about the marriage, and this statement of counsel could only have hastened the thought. Again, it was not prejudicial, because the jury knew the defendant had not married her, and her "importuning and begging" and his refusal to yield, if effective at all, would tend rather to corroborate his statement that he had not promised to marry her than to the contrary.

*Remarks of Counsel.*

IV. I am also of the opinion that it was not reversible error to permit the father of prosecutrix to make the general statements attributed to him, such as: Appellant treated prosecutrix "like a sweetheart;" "he seemed to think a lot of her." His knowledge and information upon which these alleged conclusions were predicated were completely brought out and developed in evidence, and the jury was in a position and fully capable of determining whether or not such conclusions were warranted. Cross-examination was a complete shield to this alleged vice.

*Conclusions of Witness.*

But there is another reason why this assignment is without force here. The record discloses that no exceptions were saved to the ruling of the court when this evidence was introduced.

V. Relative to the statement of Jeffries that "from the way they [meaning certain women] had talked about him [appellant] they had no use for him," the record discloses that this came out in connection with his explanation of certain matters concerning which he had been interrogated on cross-examination. After the statement was made, defendant's counsel merely objected, and at no time requested that the answer be stricken out. We cannot justly anticipate what the trial court would have done had the proper motion been made, nor can we convict it of error in not acting when there was nothing calling for action. The court in ruling, simply directed that they "go ahead," and after this no further reference was made to this subject. I do not think the matter is open to review.

**No Motion to Strike Out.**

VI. The propositions discussed in paragraphs IV, V and VI are likewise, in my opinion, insufficient to warrant a reversal.

VII. Unless the facts in this case are sufficient to warrant an affirmance, we have judicially committed many grievous and unpardonable sins.

I, therefore, dissent from the majority opinion in this case, and am of the opinion that the judgment should be affirmed.