THE STATE v. GORDON KYLES, Appellant.

Division Two, February 19, 1913.

1. MURDER: First Degree: Deliberation. Where there is no pretense of killing by poison, by lying in wait or in the perpetration of any of the crimes designated by the statute, a verdict of guilt for first degree murder can be sustained only by evidence of a wilful, deliberate and premeditated killing.

2. ————: Second Degree: Intentional Killing with Deadly Weapon: Presumption. From an intentional killing with a deadly weapon, nothing more appearing, there arises a presumption that the act constitutes murder in the second degree.

3. ————: Deliberation: Evidence. Direct evidence of deliberation in a murder is not necessary; this element may sufficiently appear from facts and circumstances, but it must be proved in some way.

4. ————: ————: ————: Instructions. It is *held* in this prosecution for murder that there was no evidence of deliberation, and therefore it was error to instruct upon murder in the first degree.

5. ————: First Degree: Duty of Jury: Evidence. While it is true that the statute (Sec. 4450, R. S. 1909) requires the jury, under an indictment for first degree murder, to inquire as to the degree of the crime, yet the duty of so inquiring cannot devolve upon the jury until some evidence of murder in each of the degrees is offered.

6. ————: Intentional Killing with Deadly Weapon: Extenuating Circumstances: Deliberation: Evidence. It is sometimes said that in case the evidence shows an intentional killing with a deadly weapon and also "shows an entire absence of extenuating circumstances" a finding of deliberation will be upheld, but,

without discussing the applicability generally of suoh rule un-
der the Missouri statute, it will suffice to say that a case does
not fall within that rule where no one pretends to have seen
the fatal stroke with the knife, or to have heard what was said
or to have seen what was done by deceased at the moment.

7. ———: Flight: Presumptions: Instructions.    Where the evi-
dence in a prosecution for murder tends to show only that de-
fendant, after the killing, wandered drunkenly around the town,
going first in the direction he held before the homicide when
called back by deceased, that he returned to his home, entering
the yard from the street, attempted to enter, demanded en-
trance, struck a match, and, finding he could not get in, started
back to the street and in the direction of the scene of the killing
and was then arrested, it is *held* that no instruction on flight
was warranted.

8. ———: ———: Evidence: Should be Weighed .with Other Evi-
.dence.    An instruction on flight should not be so phrased as to
indicate that the presumption therefrom was specifically one of
guilt of murder in the first degree.   The rule best supported by
reason and authority is that flight to avoid arrest and prosecu-
tion is merely a circumstance to be weighed by the jury in
connection with the other evidence in the case in determining
the issues.

9. ———: Self-Defense: Evidence: Instructions: Intent.    Where
the testimony of the defendant in a prosecution for murder
tended to show that he had reasonable cause to believe and did
believe his life was in danger, and where such testimony did
not directly negative an intent on his part to inflict the wound,
instructions on self-defense were properly given.

Appeal from Livingston Circuit Court.—*Hon. Arch
B. Davis,* Judge.

REVERSED AND REMANDED.

*Lewis A. Chapman* for appellant.

*Elliott W. Major,* Attorney-General, and *Camp-
bell Cummings,* Assistant Attorney-General, for the
State.

BLAIR, C.—From sentence of death imposed by
the circuit court of Livingston county defendant ap-

peals.  John Watts, the deceased, and defendant were and for years had been intimate friends, and that friendship, according to the evidence for both State and defense, had suffered no previous interruption.

Deceased, his wife and one Urton lived in a house on Third street, in Chillicothe, and defendant lived some two or three blocks distant.  Deceased was a butcher, conducting no establishment of his own, but accepting employment in killing hogs and cattle for others as opportunity offered.  Defendant at times engaged in the same business and he and deceased frequently worked together.

On the day of the killing defendant, Urton, deceased and the latter's wife were at the Watts home and had been drinking a mixture made of water and alcohol which deceased procured and his wife prepared for consumption.  None of the party seems to have been very much intoxicated, however, if Mrs. Watts is to be believed.  During the afternoon Urton and deceased had a difficulty over some coal Urton had picked up along the railroad and wanted to sell to one Elliott. A struggle or scuffle between the two ensued but neither was injured and Urton left the premises.  There is. evidence deceased was angry.  Later a corn-knife belonging to Urton was found in the room, but deceased's wife seems not to know when or how it got there, though she admits she removed the weapon after her husband was killed.

After Urton's departure, according to Mrs. Watts's testimony, deceased and defendant engaged in a friendly scuffle from which they desisted when she suggested they might knock over a lamp or table.  Immediately thereafter, she says, defendant left the house, taking with him a small rifle and a butcher knife used for killing hogs.  Defendant had asked to borrow the knife for use the following day, but deceased had declined to lend it.  With these defendant left and went west toward the business part of the city.  De-

ceased went out the back door and around the house, following defendant out upon the sidewalk in front and called to defendant, who was proceeding westward at some distance, to come back. After being called two or three times defendant retraced his steps to where deceased stood at a point some twelve feet west of the front gate to the Watts premises. Deceased's wife, at this juncture, was standing at the front doorway of the house, about twenty-five feet from her husband and defendant. An electric light almost directly in front of the house enabled her to see what occurred. She says her husband and defendant conversed there, but she heard no angry word, saw no struggle and does not pretend she saw a blow struck by either. In a few moments defendant turned away and again walked westward, and after he had proceeded some distance she says she heard her husband say, "Gordon, come back," and a moment later she testifies he said, "My God, Gordon stabbed me." •Another witness for the State testified he saw defendant walking along the sidewalk about seventy-five yards west of deceased, and heard the latter call defendant and saw defendant turn and go back to where deceased was waiting for him. Witness walked on toward town and soon defendant turned and ran from where deceased was, crossed the street and caught up with witness and he then noticed defendant had a rifle in his hand. A gentleman in front of the two attracted defendant's attention and defendant asked who he was. Witness told defendant "not to shoot that man, that he had nothing to do with their trouble." Defendant went on west, crossed to the south side of the street and walked on away.

When defendant started away from where he and deceased had stood, the latter "broke out in a cry and began to call him to come back." Witness did not hear what was said between the two; could hear the sound of voices but could not understand what was

said.  When defendant left deceased the witness heard a woman calling for help.  Witness saw no struggle, no blows.  This witness places Mrs. Watts out on the sidewalk near her husband at the time the latter first called defendant to come back and says she was urging the former to come in and have no trouble.  These two are the only eye witnesses to anything connected immediately with the killing and neither pretends to have seen defendant stab deceased.

The only wound upon the body was a knife wound in the leg.  The wound of entrance was almost exactly the width of the knife blade, the weapon having been driven straight to the femur and the point having severed the femoral artery.  Death resulted from loss of blood in about an hour and one-half or two hours after the stabbing occurred.  The wound on the deceased's leg was about three or four inches below the hole cut by the knife in deceased's trousers.

From the point on the sidewalk where the witnesses say deceased was standing when defendant returned to him, after being called back, to the bed upon which deceased fell, there was a trail of blood.  Defendant's hat was afterwards found in the house.  The knife and rifle were found in the western part of Chillicothe and there was evidence that about an hour after the stabbing defendant was seen, apparently very drunk, in that part of the city.  He was arrested at his home nearly two hours thereafter.  There is some little evidence of furtiveness in defendant's manner of approaching his home, but the only witness who testified in regard to this says defendant knocked on the door two or three times and demanded to be let in, but, receiving no reply, struck a match, stood there a little while, and then "came back past the west side of the house and as he got to the southwest corner he made a dive out where there is some brush there. . . and came right out toward the yard fence." Witness, seeing defendant would discover him, started toward

his own home and as he passed defendant the latter "ran his hand into his side pocket." Witness said "Good evening" and defendant said "Hello, is that you, Uncle Dave?" Witness thereupon covered defendant with his rifle and said, "Gordon, come go with me," to which defendant responded "All right."

At this time two blocks and a half away at deceased's residence a somewhat large and excited crowd had gathered. As witness and his prisoner proceeded westward along the street defendant fell down several times and acted as if drunk. He was bareheaded and unarmed.

The information charged not only murder in the first degree but also charged defendant had been previously convicted of assaulting one Lina Kiles with intent to kill her. The judgment of conviction of that assault was in evidence as was a certificate of Warden Andrae to the effect defendant had been incarcerated in the penitentiary, served the term adjudged and had been discharged.

The evidence for the defense disclosed that deceased and defendant had been together most of the day from eleven a. m. until the killing took place and that they were at all times observed to be in a good humor. Sometime after Urton had brought Elliott to the Watts home to close the sale of coal and failed, Urton and deceased were seen in the street in front of the house "quarreling and fussing" and deceased seemed very angry.

There was some evidence deceased and his wife differed as to permitting Urton to continue living with them, deceased opposing it. According to defendant's testimony there is reason to believe deceased was jealous of Urton.

Defendant testified as to being with deceased various times during the day and to deceased having ordered Urton to leave the place. This last resulted in a difficulty between deceased and Urton in which

blows were struck. Defendant and Mrs. Watts sepa-
rated the combatants, the former pushing deceased
into another room and the latter attempting to hold
Urton. Sometime during the altercation Urton se-
cured a corn-knife. Urged by Mrs. Watts, Urton left
and as he did so deceased seized a rifle and attempted
to follow. Defendant took the weapon from him and
ran out of the house and went westward on Third
street. According to defendant deceased followed and
called to him to come back and bring the rifle, finally
threatening to have him arrested for robbery if he did
not do so. Defendant says he then returned and, at
deceased's request, re-entered the house. Deceased
said to defendant he had considered him his friend
and defendant answered him he was his friend. De-
fendant testified deceased replied, ''No, you ain't;
you have deceived me. I have known you a long time
and you went against me for George Urton, the son-
of-a-bitch. I didn't get to get Urton; I will kill you.''
Deceased closed the door and stood against it and
when asked to let defendant out responded, ''They'll
take you out.'' Defendant says he retreated into the
living room and deceased followed and assaulted him
with the butcher-knife, the first thrust cutting defend-
ant's sleeve and inflicting a wound on his arm, the
effects of which seem to have been yet visible at the
time of the trial. The cuts in defendant's clothing
and arm were exhibited to the jury.

At this juncture defendant says he seized de-
ceased's hand and a struggle for the knife ensued in
which both contestants finally got down upon their
knees; that while they were struggling and swaying
to and fro deceased suddenly cried out as if in pain
and relaxed his hold upon the knife, whereupon de-
fendant seized it and hurried out of the house, pick-
ing up the rifle as he went. This he explained by say-
ing he did not want to be shot in the back. According
to defendant deceased called to his wife he was cut

and followed defendant from the house. How far de-ceased followed he did not know. Defendant says the rest was like a nightmare "everybody after him and he didn't have no friends; he was trying to get a place of refuge; everybody kicking at him." He declared he did not know where he went. Soon after his arrest defendant signed a written statement which substantially accorded with his testimony at the trial.

Among other instructions the following was given:

"The court instructs the jury that flight raises the presumption of guilt, and if the jury find and believe from the evidence that the defendant, after the alleged commission of the offense set forth in the information, fled from the scene of the difficulty, for the purpose of avoiding arrest and trial for said offense, you may take this fact into consideration in determining his guilt or innocence, but in considering the evidence that the defendant left immediately after the difficulty, you will also consider the evidence before you, respecting the defendant's mental condition at the time, and that immediately after the defendant left the scene of the difficulty he lost his memory and had no recollection of anything that happened from that time until he remembered being in the county jail of this county on the following morning, and you will also consider the evidence that the defendant was arrested in the vicinity of his own home."

I. Counsel for defendant contends the evidence is insufficient to support a conviction of first degree murder and the learned Attorney-General concedes this presents a serious question. In this case there is no pretense of killing by poison, by lying in wait or in the perpetration of any of the crimes designated by the statute, and, as a consequence, the verdict cannot be sustained except by evidence of a wilful,

Murder: First Degree: Deliberation.

deliberate and premeditated killing. The contention is that there is no evidence of deliberation. From an intentional killing with a deadly weapon, nothing more appearing, there arises a presumption that the act constitutes murder in the second degree. The court, in substance, so instructed the jury in this case. It is true that direct evidence of deliberation is not necessary and true that this element may sufficiently appear from facts and circumstances. It is also true that it must be proved in some way, either by direct evidence or by facts and circumstances which sufficiently evidence its existence. Certain facts are by the statute made sufficient evidence of deliberation, but of none of these is there evidence in this case. There is no evidence of threats, former grudge or preparation. There is no evidence of previous hostility of defendant toward deceased. The State's evidence clearly explains defendant's possession of the weapon he used and negatives any inference he sought a quarrel with deceased. It was deceased who called defendant back as the latter was leaving the scene, after he had proceeded a considerable distance. There is not a circumstance in evidence which tends to prove anything more heinous than an intentional killing with a deadly weapon. This the law presumes to be murder in the second degree when nothing else appears. In order to make it first degree murder it was incumbent upon the State to offer evidence of deliberation. [State v. Young, 119 Mo. l. c. 525; State v. Silk, 145 Mo. l. c. 248-249; State v. Lane, 64 Mo. l. c. 321-322, and cases cited; State v. Carver, 22 Ore. l. c. 604; State v. Fuller, 114 N. C. l. c. 900-901; Watson v. Commonwealth, 85 Va. l. c. 868; Hamby v. State, 36 Tex. l. c. 528; Craft v. State, 3 Kan. l. c. 485, et seq.; Wharton on Homicide (3 Ed.), secs. 149-150; 1 McLain's Crim. Law, sec. 359.] Direct evidence is, of course, not essential. The jury may deduce a finding of deliberation from facts and circumstances in evidence.

It is true that the statute (Sec. 4450, R. S. 1909) requires the jury, under an indictment for first degree murder, to inquire as to the degree of the crime, but the duty of so inquiring cannot devolve upon the jury until some evidence of murder in each of the degrees is offered. The decisions in States in which the intent to kill is the distinctive element of murder in the first degree are, of course, of no value under our law on the question here involved. In some decisions in this State language is used which might justify the inference that the court meant that every intentional killing with a deadly weapon would warrant a verdict of first degree murder, but, in view of the well settled rule as to the presumption that such a killing is murder in the second degree, this interpretation of these decisions is incorrect. Further, an examination of the facts in these cases invariably discloses some evidence of deliberation. It is sometimes said that in case the evidence shows an intentional killing with a deadly weapon and also "shows an entire *absence* of extenuating circumstances" a finding of deliberation will be upheld. Without discussing the applicability generally of such rule under our statute, it will suffice to say that the present case is not one falling within it. No one pretends to have seen the fatal stroke given, nor to have heard what was said nor to have seen what was done by deceased at the moment. Whatever the reason for it, the State's witnesses, judging from their testimony, might as well have been blindfolded or on the other side of an impenetrable wall so far as concerns the occurrences at the very time of the killing. This peculiarity of the testimony may suggest doubts as to its credibility but cannot add any fact to those to which the witnesses testify. A careful examination of this record convinces us that, in view of the peculiar facts disclosed, no instruction on murder in the first degree should have been given.

II. There was no evidence upon which to base the instruction on flight. Defendant was arrested at his home two blocks and a half from the scene of the homicide and at the moment of his arrest was not leaving but was approaching that place. "It is not every going away from the place of the homicide that raises the presumption of the guilt of the accused." [State v. Hopper, 142 Mo. l. c. 483; State v. Evans, 138 Mo. l. c. 127.] The most the evidence tends to show is that defendant wandered drunkenly around the city of Chillicothe, going after the homicide in the direction in which he was proceeding before the homicide when called back by deceased, that he returned to his home, entering the yard from the street, attempted to enter, demanded entrance, struck a match and finding he could not get in started back to the street and in the direction of the Watts residence and was then arrested. This evidence did not warrant an instruction on flight. Had the evidence warranted such an instruction it should not have been so phrased as to indicate that the presumption was specifically one of guilt of murder in the first degree. The instruction is so worded as to be misleading in this respect.

*Flight: Presumptions.*

Further, though many decisions of this court approve instructions to the effect that flight to avoid arrest and prosecution raises a presumption of guilt the rule best supported by reason and authority is that such flight is merely a circumstance to be considered and weighed by the jury in connection with the other evidence in the case in determining the issues. The contrary rule seems to be peculiar to this State, as has been pointed out by other courts. [State v. Poe, 123 Ia. 118; Territory v. Lucero, 16 N. M. 652, 39 L. R. A. (N. S.) 58 and note.] Though this rule be adhered to, however, the instruction given had no evidence to support it and was, consequently, erroneous.

III.   The court instructed on self-defense and might well have given the jury the usual directions on this subject. The testimony of defendant **Self-Defense.** tended to show he had reasonable cause to believe and did believe his life in danger.  His testimony did not directly negative an intent on his part to inflict the wound deceased received, and, consequently, the cases (State v. Smith, 114 Mo. l. c. 421, and cases cited) based on testimony of that character are not in point.  If his testimony is to be believed, he is guiltless whether he struck intentionally or the wound was an incidental result of his efforts at self-protection.  A specific intent to kill was not essential to justify him.  It was for the jury to say which inference they would draw from his testimony.

The judgment is reversed and the cause remanded.  *Roy, C.,* concurs.

PER CURIAM.—The foregoing opinion of BLAIR, C., is adopted as the opinion of the court.  All the judges concur.