THE STATE v. LOUIS HAYES, Appellant.—19 S. W. (2d) 883.

Division Two, August 6, 1929.

*Cope & Tedrick* and *D. B. Deem* for appellant.

*Stratton Shartel,* Attorney-General, and *A. M. Meyer,* Assistant Attorney-General, for respondent.

580

DAVIS, C.—In an indictment filed in the Circuit Court of Butler County, defendant was charged with murder in the first degree for the killing of one Lester Mathis. A trial in Butler County resulted in a hung jury. A change of venue was then awarded to Ripley County, and a second trial also resulted in a hung jury. A third trial was had and the jury returned a verdict finding defendant guilty of murder in the second degree, and assessing his punishment at ten years' imprisonment in the penitentiary. From the judgment entered on the verdict, defendant appealed.

Defendant testified and admitted that he shot Lester Mathis, the deceased, with Mathis's automatic pistol, and killed him. The only witness for the State present at the occurrence was one Tom Goodman. He testified, in substance, that he roomed and boarded at defendant's home in Butler County. He said he worked for deceased and defendant both. On Friday, August 14, 1925, deceased and Goodman drove to defendant's home in deceased's Ford car, arriving there between two and three in the afternoon. Deceased sat on the porch, while Goodman entered the front door and went to his room for a change of clothing. Upon making the change, he left the house by way of the back door to the place where defendant was cutting wood, south of the house, close to the southeast corner, and which was about thirty feet from the front porch. From the porch to the front gate where the car was parked was about twenty-five steps. Goodman and defendant discussed Goodman's wages, amicably it seems, and defendant asked Goodman what deceased was going to do. Goodman then started for the car. As Goodman went by deceased, deceased asked him where his gun was, and he replied, "Hell, I don't know. I guess Louis [defendant] has it." Goodman went to the car and deceased turned to his left. As Goodman set his foot on the running board, he heard a pistol fire, and looked around and saw deceased stooped over, coming toward him, and defendant following with a pistol, and he then saw the smoke of a second shot. The second shot immediately followed the first. Goodman said he did not think he could have heard a common conversation, and he did not hear deceased say anything except what deceased said to him. After the second shot, deceased eased up to the steps of the porch, drew one breath after Goodman reached him, and died. Goodman did not see anyone present at the time of the killing except defendant and deceased.

The evidence for the State further develops that no weapon was found on deceased, not even a pocket knife. Two wounds appeared on the body of deceased, one entering about the seventh rib on the left side, ranging across and upward through the body and coming out about the fourth rib on the right side, a little under the armpit. The other wound entered about eight inches below the nape of the neck and about the middle of the spinal column, ranging upward and coming out about the second rib on the right-hand side. One shot passed through both lungs. Either of said wounds were sufficient to produce instant death.

The testimony for defendant tends to show that deceased was met by a witness on Monday before the Friday he was killed. He asked witness if he had a gun, and said that he had got mixed up with Louis Hayes's wife, and Louis was going to kill him. On cross-ex-

amination, said witness was asked if he was not in the bootlegging business, and he denied it. He was also asked if he did not tell the prosecuting attorney in his office that he was going to quit bootlegging, and he replied, ''No.''

The wife of defendant testified that, on Monday before the killing, deceased came in and asked where defendant was, and, upon being told that he was out in the barn, deceased took hold of her and pulled her over toward him. Defendant saw him, spoke to him about it, and deceased apologized, saying that he would never be guilty of such conduct again, and left. Again on Wednesday, deceased came to the house. Defendant and his father were present, and his father left in the car with deceased to go to Poplar Bluff. During the day on Thursday, deceased again came to the house. Defendant was in the barn lot. Deceased asked where defendant was, and, upon being told, deceased grabbed witness and told her he was going to make her come across. He repeated that he was going to do so, and said that, if defendant said anything, he would get him. Defendant then appeared and witness told him what deceased had done. Defendant ordered deceased to leave and to stay away, but he replied that he would come back when he got ready, and that when he came again, it would be defendant's time to go. Deceased left. That same evening deceased returned while defendant was in Poplar Bluff. He found witness in the bedroom, and told her she would have to come across. He grabbed her and threw her across the bed, laying his gun down beside him. Upon announcing that she heard someone coming, deceased jumped up to shut the door, and thereupon witness also jumped up, took the gun and her baby and fled upstairs and locked herself in a room. Deceased said he would come back when he got ready, and that when he did come back, defendant would have to go. He ordered her not to tell defendant of the occurrence, but on defendant's return she told him all that happened, and how she obtained the gun. She next saw deceased on Friday, between two and two-thirty in the afternoon. He and Goodman came to the house in a car. Deceased sat on the front porch while Goodman came into the house. She saw deceased as he came around the house toward defendant, and heard deceased call him a dirty coward, and say, ''G— d— you, I told you that I would come back, and now it is your time to go.'' Then he reached into his hip pocket. Deceased did not talk so very loud, but he appeared to be mad. After deceased put his hand into his hip pocket, defendant shot him. She had never given deceased occasion to make advances toward her. She saw both shots fired.

A number of witnesses testified that defendant's reputation, as a peaceable and law-abiding citizen, was good. Defendant gave

practically the same relation of facts as is shown by the testimony of his wife. He further testified that, in response to a telegram to his wife's aunt at Portland, Oregon, that he was going to send his wife to her, he received a telegram, introduced in evidence, dated August 13, 1925, from his wife's aunt, "Send May now. Will meet her train." He said that he and his wife decided that it was best for her to go to Oregon because of the advances of deceased toward her.

In rebuttal, witness Harper testified that he had heard defendant's wife say that she did not know the cause of the shooting, and that she did not see the shooting.

Mrs. Mattingly testified that she heard defendant's wife say that she did not see the shooting at all, that she was in the kitchen washing dishes. Other facts, pertinent to the issues raised, will be adverted to in the course of the opinion.

I. Defendant charges the trial court erred in refusing to grant him a new trial. The error is predicated on the action of the deputy sheriff, without the knowledge or permission of the court, in going to the jury room or to the door and talking to the jury, and in permitting the jurors to separate.

The sections of the Revised Statutes 1919, or the relevant portions thereof, read:

"Sec. 4026. With the consent of the prosecuting attorney and the defendant, the court may permit the jury to separate at any adjournment or recess of the court during the trial in all cases of felony, except capital cases; . . .

"Sec. 4027. When the argument is concluded, the jury may either decide in court or retire for deliberation. They may retire under the charge of an officer who, in case of a felony, shall be sworn to keep them together in some private or convenient room or place and not permit any person to speak or communicate with them, nor do so himself, unless by the order of the court or to ask them whether they have agreed upon their verdict; and when they have agreed, he shall return them into court, or when ordered by the court. The officer shall not communicate to any person the state of their deliberations.

"Sec. 4078. The court may grant a new trial for the following causes, or any of them: . . . second, when the jury has been separated without leave of the court, after retiring to deliberate upon their verdict, or has been guilty of any misconduct tending to prevent a fair and due consideration of the case; . . ."

With respect to the above issues a hearing was had after the filing of a motion for a new trial. A summary of the evidence is

essential. It warrants the finding that the trial commenced Tuesday morning and was submitted to the jury Wednesday afternoon. Before submitting the cause, however, the court swore the deputy sheriff as provided in Section 4027. After deliberating Wednesday afternoon, the jury were taken to supper at six P. M. After supper the jury were returned to the jury room adjoining the court room and again deliberated. The clerk of the court testified that he was in the court room until eleven P. M. Wednesday night, and while he was there, the deputy sheriff in charge of the jury went to the door of the jury room twice, and asked them if they had agreed upon a verdict. Later he said the sheriff asked them if they had agreed upon a verdict, or if they thought they were about to agree upon a verdict, and they said, "No." Juror Emmons said that the sheriff came to the door and asked them if they had reached a verdict, or how they were getting along. Around midnight the deputy went to the door of the jury room and suggested that the jurors occupy the court room, as there was no fire in the jury room. The jury then came in the court room and discussed the cause and deliberated in the presence of the deputy sheriff in charge. He talked and joked with them, but what was said no one remembered definitely. They worked and deliberated on the facts in the presence and hearing of the deputy sheriff. A portion of the time, however, he was in the jury room while the jury were in the court room, but the door between was open. The deputy around four A. M. reclined on chairs in the jury room. It was during this time that two of the jurors, without his knowledge, he said, left the court room and the presence of the other jurors, without an officer in charge, and went to the lavatory in the basement of the court house. The juror, who testified, stated they saw no one. At five-thirty A. M. the jury went to breakfast. On their return, they were taken to the jury room where they again deliberated and reached a verdict. On Wednesday afternoon, the court told the deputy to take the jury to supper and bring them back to the jury room, and let them work until about bedtime, and then arrange for beds for them. On Wednesday, about nine P. M. the deputy went to the hotel and woke the judge and the judge told him to take them to bed whenever they desired to go.

The indictment charged defendant with murder in the first degree, and the court instructed the jury with respect to murder in the first degree and authorized them to fix the punishment, if they found him guilty of first degree murder, at death. Consequently, this is a capital case. [State v. Gray, 100 Mo. 523, 13 S. W. 806; State v. Witten, 100 Mo. 525, 13 S. W. 871.]

The evidence shows with certainty that the jurors, after the cause was submitted to them and after they began to deliberate on their

verdict, without the knowledge of the deputy sheriff in charge, separated, resulting that the deputy lost control and supervision of their movements, thus affording an opportunity for outside and sinister influences. Sections 4027 and 4078 have been held to be mandatory in some few cases. In State v. Orrick, 106 Mo. 111, l. c. 126, 17 S. W. 176, 329, the court, in construing what are now Sections 4027 and 4078, supra, say:

"It will be observed that these sections, by their express terms, only apply to the conduct of juries after they retire, under the charge of a sworn officer, to deliberate upon their verdict. From that time until their final discharge the law is imperative that they shall be kept separated. A failure to observe the requirements of Section 1910 will be cause for a new trial under Section 1966. These sections have been construed, by this court, in a number of cases. They are held to be mandatory to the extent, at least, of preventing any opportunity for misconduct on the part of jurors; or suspicion of improper influences upon them. If, after the case has been finally submitted, and before verdict, it be shown that opportunity was given for improper influences to be used on any juror, that alone would require a new trial, under the construction put upon Section 1966 by the court, in the cases last cited. The intention of the Legislature in adopting Sections 1910 and 1966, as construed, was to require a new trial whenever there was such a separation of the jury as gave opportunity for outside influences, and to cut off inquiry as to whether such influences were, in fact, brought to bear upon it."

In State v. Howland, 119 Mo. 419, 24 S. W. 1016, this court said that it was error to permit two of the jurors to separate from the other jurors in charge of the deputy sheriff, and go to a toilet some two hundred feet distant, out of the view of the other jurymen, and unaccompanied by any officer.

In State v. Tarwater, 293 Mo. 273, l. c. 290, 239 S. W. 480, the court say: "Section 4027, Revised Statutes 1919, requires that the jury shall be kept together after they retire for deliberation, and to permit a separation after retirement for deliberation is reversible error."

In State v. Connor, 274 S. W. 28, l. c. 30, where it was shown that the jurors separated after the case was submitted, without the permission of the court and unattended by any officer, it is said: "Such separation is in express violation of this mandatory statute (Sec. 4027, R. S. 1919) and requires the granting of a new trial."

Following the interpretation of our statutes by the adjudicated cases on the subject, we think it was the intention of the Legislature, where the jurors separate, without permission of the court, unattended

by any officer, after the cause has been submitted to them to deliberate upon a verdict, where an opportunity was afforded for outside or sinister influences, to forestall inquiry as to whether any outside or sinister influence was exerted on them, thus requiring the courts to grant defendant a new trial. However, even though we apply the rule as to separation of the jurors during the progress of the trial, that separation will constitute a ground for a new trial, unless it is made affirmatively to appear on the part of the State that the jurors were not subject to an improper influence, yet we do not think the State has met the rule. The evidence of the one juror, who testified to the separation, does not go further than the statement that they saw no one. But that fact alone does not controvert the exercise of a sinister influence, for one juror may have purposely brought about the separation of the other from the panel to influence him improperly. Cast with the burden to establish the absence of all phases of an improper influence, the State has failed to sustain it.

Furthermore, we think the deputy sheriff violated that part of his oath prescribed by Section 4027, which forbade him to speak or communicate with the jury, unless by order of the court. He violated the statute by his presence in the same room with the jurors during their deliberations, as well as by talking and joking with them.

II. Defendant complains of the argument of counsel for the State to the jury. While the arguments are not *in haec verba* preserved in the record, they are sufficiently preserved by the record, we think, for our consideration. [State v. Evans, 267 Mo. 163, 183 S. W. 1059.] It is necessary to state that Mr. Cope represented the defendant, and Mr. Abington the State. The matter complained of reads:

"MR. COPE: We object to the remark of the prosecuting attorney that 'when Joe Hurt said he did not tell me he would quit bootlegging, he swore to a lie.' That is improper and outside the record and we ask that it be stricken out, and that the prosecuting attorney be rebuked for making such statement.

"THE COURT: Mr. Prosecuting Attorney, that is out of order. You should not have made that remark and you know it. That statement will be stricken out and the jury is instructed to disregard it.

"MR. COPE: We except to the failure of the court to properly rebuke the prosecuting attorney. . . .

"MR. COPE: I object to the remark of the prosecuting attorney about the six little orphan children of Lester Mathis. That is im-

proper, prejudicial and outside the record. We ask that counsel be rebuked.

"THE COURT: The objection will be sustained. Confine your arguments strictly to the testimony in the case.

"MR. COPE: We except to the failure of the court to rebuke the prosecuting attorney. . . .

"MR. COPE: We object to the remark of the prosecuting attorney when he referred to 'this woman who sat here' as Mathis's wife. There is no testimony that Lester Mathis had a wife.

"THE COURT: The objection is sustained and that remark will be stricken out. . . .

"MR. COPE: I object to the statement of counsel that Mrs. Minton said to him, 'Mr. Abington, I am Louis Hayes's wife's aunt.'

"MR. ABINGTON: I will withdraw the statement if there is any objection to it.

"MR. COPE: I object to the statement that she said, 'I am going to tell the truth.' That is outside the record, is prejudicial and I ask that counsel be rebuked.

"THE COURT: Confine yourself to the testimony in this case. That will be stricken out, and the jury will disregard it.

"MR. COPE: We except to the failure of the court to rebuke counsel."

The facts develop what may be said to be a close case. If there was any doubt of it, the failure of the jury on two previous trials to agree on a verdict evidences it. The defendant charges the prosecuting attorney, in the course of his argument, with presenting to the jury facts not in evidence, based on his own personal knowledge only. Such departure from the record facts cannot be justified. [2 R. C. L. 420.] There is no doubt but that the prosecuting attorney stated facts to the jury not in evidence. On cross-examination, the prosecuting attorney asked the witness, Joe Hurt, if he was not in the bootlegging business, and witness denied it. He further asked him if he did not tell the prosecuting attorney in his office that he was going to quit bootlegging, and witness said, "No." In his argument the prosecuting attorney remarked, "When Joe Hurt said he did not tell me he would quit bootlegging, he swore to a lie." The statement of the prosecuting attorney presented a fact to the jury without the evidence. By his remark, he baldly impeached the testimony of the witness, and it resulted, under the facts herein, that the argument was prejudicial and incapable of being cured by the court's ruling thereon. It improperly tended to persuade the jury that the witness was a perjurer. Moreover, the vituperative language of the prosecuting attorney was unwarranted and out of place, and should never be used on a trial. In addition,

this remark, together with others which referred to the wife and children of the deceased, and the remark attributed to Mrs. Minton, were all *aliunde* the evidence, and tended to arouse the passions, prejudices and resentment of the jurors. [New York Central Railroad Co. v. Johnson, 279 U. S. 310.] It was irrelevant and immaterial in determining defendant's guilt that deceased had a wife and children. The reference to them was evidently for the purpose of arousing the passions of the jurors against defendant. The error was obvious, as well as prejudicial, and the action taken by the trial court failed to cure its prejudicial effect. [State v. Evans, 267 Mo. 163, 183 S. W. 1059; State v. Snyder, 182 Mo. 462, 82 S. W. 12; State v. Watson, 1 S. W. (2d) 837; 17 C. J. 300.]

III. While it is unnecessary to hold that it is prejudicial error, we cannot refrain from commenting upon the conduct of the prosecuting attorney, upon defendant calling a witness to the stand. He stated, "If you will call Cal Coolidge, Sam Baker, Fall and Doheny, then you will have all the politicians." This remark was seemingly called forth as the result of defendant's use of a number of people, who had held county office, as character witnesses in his behalf. Evidently, the purpose of the remark was to minimize and destroy the effect of the evidence of such witnesses. Its intended effect was to make defendant's defense of previous good character appear ridiculous. It tended to reduce to a farce a proceeding in a court of justice that should be conducted with solemnity. The defendant, on trial for his life, was entitled to have the trial conducted with fairness and dignity. Any other course deprived him of his rights. Inasmuch as other alleged errors probably will not occur upon a retrial, we refrain from commenting on them.

The judgment is reversed and the cause remanded. *Henwood* and *Cooley, CC.,* concur.

PER CURIAM :—The foregoing opinion by DAVIS, C., is adopted as the opinion of the court. *White, J.,* concurs; *Walker, J.,* concurs in the result; *Blair, P. J.,* concurs in Paragraphs I, III, and the result.