STATE of Missouri, Respondent,

v.

James SMALL, Appellant.

No. 47822.

Supreme Court of Missouri,

Division No. 2.

March 13, 1961.

Thomas D. Dwyer and Willard S. Tucker, Springfield, for appellant.

John M. Dalton, Atty. Gen., Robert E. Hogan, Sp. Asst. Atty. Gen., for respondent.

BARRETT, Commissioner.

A jury has found that James ("Jimmy") Small shot and killed Leroy Stafford, that he was guilty of murder in the first degree and, accordingly therefore, his punishment has been fixed at life imprisonment.

Among the instructions was one which told the jury that "voluntary drunkenness in any degree cannot justify, excuse, or mitigate the commission of a crime, and the fact, if it be a fact, that the defendant may have been drunk to any degree at the time of the homicide cannot be taken into consideration by the jury in making up their verdict." The appellant insists that the instruction was improper in this particular case, that it was erroneous and in the circumstances he is entitled to a new trial. The appellant says that the instruction is erroneous because the "defendant denied his guilt and admitted no overt act which he sought to excuse or mitigate by reason of such condition, and there was evidence that defendant was unconscious

from intoxication only seconds before the fatal shot was fired." In his argument it is stated that he "was drunk," "gave no indication that he was aware of what was going on," was apparently "passed out" or "oblivious" and therefore was *physically incapable of committing murder.*" In this connection it is said that generally the instruction is a proper statement of law (State v. Beasley, 353 Mo. 392, 182 S.W.2d 541), but it is contended that where the defendant denies guilt "and the evidence of his stupefaction from drunkenness would tend to prove he was *incapable of doing the act charged,* it is error to give the instruction."

To precisely point up the appellant's contention, it should be noted that he relies on State v. Buxton, 324 Mo. 78, 22 S.W.2d 635, 638 and State v. Barr, 336 Mo. 300, 78 S.W.2d 104, 105. In State v. Buxton the appellant and others were charged with robbery in the first degree. Buxton's defense was an alibi, that he was drunk, went to sleep in a chair, and was put to bed and was therefore not present at the robbery and of course did not and could not take part in it. In that case the court gave the conventional instruction that voluntary intoxication was no excuse for the commission of a crime. It was pointed out that the appellant denied the commission of any offense and "did not offer proof of his intoxication in mitigation of or excuse for an admitted act. He made no pretense that he was so intoxicated that he did not know what he was doing." In these circumstances the testimony as to his sodden drunkenness "went to support his alibi and to show that he was physically incapable of being at the scene of and committing the robbery, * * by reason of his complete stupefaction from intoxication." Therefore, "under the testimony in the record," the instruction should not have been given. In State v. Barr the charge was murder, but again the defense was alibi, that in a drunken carousal he became helpless and was carried from a taxicab to his room and so, of course, was not present at the homicide. Consequently

in that case an instruction which told the jury to "entirely disregard defendant being drunk" was prejudicially erroneous. In view of the appellant's contention we are not immediately concerned with whether intoxication may be considered upon the elements of deliberation and premeditation in first degree murder, or with whether the "volition" of a drunken man "in forming and carrying out a design to murder, (is) different in criminal effect than that of a sober man." Annotation 12 A.L.R. 861, 883, 886.

On December 6, 1958, Jimmy Small and Bobby Young got off from work at 4:30 in the afternoon and after a few errands they and two other young men purchased a half gallon of wine. They went to one of the boy's home, sat around, talked and drank. By 5:30 or 6 o'clock they got another half gallon of wine, got some sandwiches and went to Alice Murphy's house and played cards and drank. By 9:15 they all "chipped in" and got another gallon of wine, took some of the group to their homes, rode around, and finally went to Joe Hayes' house. Joe was supposed to have a birthday party but "nobody showed up" and at 11:30 Bobby and Jimmy got Bobby's car and drove to his home to get his shotgun and shells so they could go hunting early the next morning. In addition to wine they had "some beer," an unspecified quantity, and according to Bobby Young they were both drunk. But Bobby did not testify or give evidence from which it was a fair inference that Jimmy was "passed out," or "oblivious," or "physically incapable of committing murder." Just before Leroy Stafford, the deceased, fell, he said, "Jimmy didn't look like he was asleep, to me." Jimmy testified that he and Bobby were drunk, and while he remembered being in Jones Alley, around 8 o'clock, he thought, not 12 or 12:30, he did not see Leroy Stafford and he did not remember shooting him. He said, "I don't think I did, because I thought, if I did, I think I would remember something about it." He did remember having the gun in his hands while in Jones Alley and while

he finally testified that he did not shoot Leroy, he insisted, "I believe if I had of, I would have knowed something about it, anyway." Also he says that he does not remember going to Greenfield after Stafford's death about 12:30 in the morning. But, when they went to Bobby's home for the gun at 11:30, Bobby's mother said, "you could tell they both had been drinking. * * Well, it was enough, you know, to tell that they had been drinking. I couldn't say that they were drunk, but—."

■ Thus to summarize, and with deference to counsel, there is no evidence in this record that Jimmy was in a state of "stupefaction," "passed out," or that by reason of drunkenness he was incapable of loading, aiming and firing a shotgun, or, as his counsel say, "incapable of doing the (physical) act charged." State v. Bartley, 337 Mo. 229, 237, 84 S.W.2d 637, 641. It will clearly appear in another connection that the plea of drunkenness in this case did not and could not have had the force and effect that it had in State v. Barr and State v. Buxton, supra. Therefore, in the circumstances of this record, instruction six was not improper or prejudicially erroneous for the reasons advanced.

Also in connection with the essential merits of the case, it is urged that the evidence is insufficient to warrant a finding of first degree murder because there is no direct evidence of deliberation and, it is said, no facts or circumstances from which deliberation may be inferred. V.A.M.S. § 559.010. It is contended that "the utmost," "the state's evidence tended to prove was that deceased was killed by a deadly weapon held in the hands of defendant, which act, even if intentional, raises only a presumption of second degree murder," and, standing alone, does not permit the submission and finding of murder in the first degree. In brief, the appellant contends that the circumstances of this case fall within and are governed by the circumstances and rules applied in State v. Snow, 293 Mo. 143, 238 S.W. 1069, and State v. Kyles, 247 Mo.

640, 153 S.W. 1047, 1050. "From an intentional killing with a deadly weapon, nothing more appearing, there arises a presumption that the act constitutes murder in the second degree." State v. Kyles, supra. Hence, "nothing more appearing," as the absence of evidence which "would tend to characterize the act," to show deliberation, it is improper to submit first degree murder. The state has the burden of proving first degree murder, including the elements of premeditation and deliberation (40 C.J.S. Homicide § 192, p. 1091), but as the Snow and Kyles cases recognize, "premeditation" (thought of beforehand) and "deliberation" (the cool blood) may be inferred and established circumstantially or "from the circumstances of the homicide." State v. McCracken, 341 Mo. 697, 701, 108 S.W.2d 372, 374; State v. Cade, 326 Mo. 1132, 1137–1139, 34 S.W.2d 82, 83–84. Thus the problem here is what inferences are reasonably permissible from this record, particularly from the circumstances of the homicide.

When Bobby and Jimmy got the single-barreled 12-gauge shotgun, against the mild admonition of Mrs. Young, Bobby also got nine live twelve-gauge shells, all that he had left from a full box. He kept six of the shells and gave Jimmy three. Bobby placed the shotgun in the rear of his automobile, "had the butt of the gun on the floor * * * and the rest of it was pointing up against the back rear window," and he and Jimmy resumed their rather desultory wandering. They left Bobby's and drove down to Graham's barbecue, then they stopped at Jimmy's house, went back to Graham's but there "wasn't nobody up there" and so they started down to Tommy Brown's on Jones Alley. Jones Alley is a short, very narrow paved street in Springfield, it is so narrow that automobiles traveling in opposite directions cannot pass one another. Bobby, with Jimmy in the front seat beside him, headed his automobile south into Jones Alley and when he was about 20 feet into the alley there was Harold Huddleston with his automobile headed north. Harold, incidentally, had driven in-

to the alley about 100 feet. Harold and Bobby blinked their car lights at one another, honked horns, "jowled" and cursed one another, each demanding that the other back out of the alley, Bobby finally bumping his automobile into the front of Huddleston's Mercury. Jimmy Small took no part in any of this argument, he sat silently in the front seat. While this argument was in progress a third car, also headed south, drove into Jones Alley but, of course, could not proceed and the driver, Franklin Mitchell started "honking his horn." Mitchell had left the "Key Club" on Jones Alley in a borrowed automobile, picked up his cousin Leroy Stafford at Graham's barbecue and they were returning to "the club" when they drove into the blocked alley. Stafford, unarmed, got out of the automobile driven by Mitchell and first went up to Huddleston's automobile and Huddleston informed him that Young's car was blocking the way and so he walked up to the driver's side of Young's car and "cussed us." As Stafford stood there beside Young's automobile, only a foot or two from the left front door and window, there was a blast from a shotgun and Stafford fell. According to the pathologist there were shotgun pellets, "paper-like material" and "waddings" in Stafford's left chest cavity and his "heart had been practically blown away." As Stafford fell Bobby backed his automobile out of Jones Alley and he and Jimmy drove to Greenfield to "Imogene's house" but when Bobby knocked on her door she refused to admit them. They slept in the automobile and in the morning "started back to Springfield" but were met a few miles from Willard by sheriff's and police officers and arrested.

Bobby Young has now "turned state's evidence" and the appellant assails his credibility. However, his most damaging testimony was that he sat looking at Stafford, "but I didn't know what was wrong with him" when he fell, and, he testified that Jimmy said, " 'Let's go,' * * * I went and shot that boy." Also he says that after they left Greenfield, "I asked Jimmy did he shoot that boy, and he said 'Yowe.' " He said that he did not see the thirty-inch barreled shotgun in Jimmy's hands, did not hear a shot or "remember hearing one." When asked whether he saw Jimmy shoot Stafford, he said, "I didn't see him. I couldn't say he did shoot him. I didn't see him." He said, "I was all shook up, and all that," and finally he could not remember whether Jimmy had said that he shot Stafford, "it sounded like he said it. * * * I did hear him say somebody shot somebody." There is other incredible evidence and there are astonishing inconsistencies and if these and the foregoing were the only facts and circumstances it might well be that the appellant's case would fall within the Snow and Kyles cases. But these are not the only circumstances, they are in fact only the background of the crucial, determinative circumstances.

When Mitchell drove into Jones Alley he stopped his automobile directly behind Young's automobile, "five feet, or close to it." He recognized the automobiles and their owners and he saw Jimmy Small sitting in the front seat next to the driver, Young. Stafford left Mitchell's car unarmed, and Mitchell saw him speak to Huddleston who then moved his car over into a yard. And then he saw Stafford walk up to Young's automobile, two or three feet away from and facing the driver's window. He says that Stafford stood there a minute or two and that the appellant, Jimmy Small, shot him. On cross-examination this was his detailed description: "Well, he (Small) took the gun and he put it in this window, in the car window. I didn't—I didn't exactly see him just stick the gun up and point it at him, but after I seen the flash, well, I seen—I saw the gun in his possession. He had the gun, and he was taking it down." He said that he did not see Small pull the trigger, but he repeatedly demonstrated that Jimmy was holding the gun by the stock and the barrel, pointed at an angle directly in front of Bobby Young. Repeatedly, he said, "I saw a flash, and when I saw the flash I saw him with the

gun. * * * He was—well, he was taking it out of the window." After Stafford fell Mitchell got out of his automobile and, he says, "they drove off, real fast."

█ The single-barreled shotgun was a "hammer shotgun" and before it can be fired it is necessary to first pull the "hammer back" or cock the gun and then pull the trigger. Furthermore, it was necessary for someone to load this shotgun before it could be aimed and fired successfully. There is necessarily no testimony as to what or who Stafford could see in the automobile, but as far as he was concerned the shotgun if not Small was concealed. The evidence of flight is not too compelling, they all knew one another and there wasn't the slightest chance of concealing identity—and yet "they drove off, real fast" and drove all the way to Greenfield in the early hours of the morning even though they were on the way back to Springfield when arrested five or six hours later. When they were arrested and the automobile was searched the shotgun was found on the floor beneath the rear seat, and it had been partially if not entirely disassembled. The hand-guard, or the "forearm" was missing when the disassembled gun was found under the rear seat and the next morning it was found "under the front seat of the car * * * next to the driver's side." Stafford was unarmed, he was shot at close range and from the shotgun blast his "heart had been practically blown away." There was no evidence of enmity or of previous ill feeling between Small and Stafford, and on this occasion there were no harsh words or challenges, they did not so much as speak. In short, as to the issue precisely involved here, deliberation and premeditation and therefore first degree murder, the case is admittedly close. Nevertheless, in all the circumstances and particularly the circumstances immediately attending the killing, the inferences of premeditation and deliberation are permissible. State v. Page, Mo., 130 S.W.2d 520 and 1 Warren, Homicide, Sec. 78, loc. cit. p. 379.

When Young and Small got the shotgun about 11:30 Young had 9 live shells, he kept 6 and gave Small 3. When they were arrested and searched out on the highway Young had 6 live shells. At that time a deputy sheriff found 2 live and 1 spent twelve-gauge shells on the floor of the automobile, "more or less where the person riding next to the driver would be sitting." Subsequently another live shell was found, thus there were 9 live shells and 1 spent shell although Bobby and Jimmy started out with 9 live shells. Bobby was of the opinion that the spent shell may have come from a hunting trip some time ago, although this is not the only permissible inference. While there were no ballistics tests and no direct evidence that the spent shell was fired from the shotgun, the shells were all twelve-gauge and "fit that shotgun." Immediately after they were found the shells were all placed in a marked envelope and preserved by a deputy sheriff. It is now objected that the court erred in admitting the shells in evidence because "the shells were not found in or taken from defendant's possession, nor was the fired shell connected with the fatal wound or with the evidence gun."

█ In support of his contention that the shells were improperly admitted in evidence the appellant cites State v. Wynne, 353 Mo. 276, 182 S.W.2d 294 and 4 Wigmore, Evidence, Sec. 1157, p. 251. In the Wynne case the 25-caliber automatic pistol, admittedly, had no possible connection with either the defendant or the crime. It was nevertheless employed in the cross-examination of the defendant and the case was concerned with the prejudicial effect of exhibiting and demonstrating before the jury with a lethal weapon not connected with the crime. There is now no objection to the introduction in evidence of the shotgun. The finding, custody and care of the ten shells were fully explained and in the circumstances of this case were relevant, had probative force and were admissible in evidence. 22 C.J.S. Criminal Law § 712, p. 1207; State v. Hermann,

Mo., 283 S.W.2d 617; State v. Pease, Mo., 133 S.W.2d 409. The shotgun and shells having some relevancy and probative force, it is not obvious or demonstrable as it was in State v. Wynne that the jury would infer from the mere production of any of the shells "the truth of all that is predicated of it." [353 Mo. 276, 182 S.W.2d 300] 4 Wigmore, Evidence, loc. cit. p. 254. But, relevancy and probative force aside, it may not be said that the admission of the spent shell or the 6 live shells found on Young was manifestly improper or inflammatory and therefore deprived the appellant of a fair trial. 24 C.J.S. Criminal Law § 1915, p. 944.

■ Finally, it is contended that the appellant is entitled to a new trial and that the trial court erred in not sustaining his motion for a new trial upon his assignment that the foreman of the jury was improperly permitted to leave the jury room and discuss with the deputy sheriff in charge of the jury whether a "defendant under a life sentence was usually paroled sooner than one sentenced for a term of years." See V.A.M.S. §§ 546.230, 547.020; State v. Jones, 363 Mo. 998, 255 S.W.2d 801; State v. Hayes, 323 Mo. 578, 19 S.W.2d 883. As to this claim the state contends that the subject may not be reviewed in this court upon this record because the appellant attempted to present the question in an untimely amendment to his motion for a new trial. The appellant has not responded to the state's contention or advanced any reason for the untimeliness of his assignment other than to say in "Defendant's Petition To Amend Motion For New Trial" that he "learned of the facts embodied in the new assignment of errors within the last ten days and that their investigation concerning said facts was not completed until the 23rd day of June, 1959" and, of course, that he had no knowledge of the fact until a juror volunteered the information to his counsel. The trial court heard and considered the motion for a new trial, including the "accompanying affidavits and evidence," but found "upon con-

sideration of all the facts" that the defendant was not entitled to a new trial. The appellant has not indicated how or why, in view of the general rules, this court should or may consider and review the amended assignment of error.

On April 15, 1959, the jury returned its verdict finding the appellant guilty. Under the rules the appellant had ten days and upon request an additional thirty days in which to file his motion for a new trial, "Provided further, the court shall have no power to make another or further extension of the time for filing said motion." Sup.Ct. Rule 27.20, V.A.M.R. On April 20, five days after the verdict, the court granted the defendant "thirty days from date of Verdict" to file his motion. The motion for a new trial was timely filed on May 14, 1959, and on June 25, 1959, the defendant filed his petition to amend the motion. Thus, as the state says, "On June 25, 1959, 72 days after the verdict was received in this case, and 36 days after the extreme limit of the time which the trial court granted" for filing a motion for new trial, the defendant attempted to amend the motion.

It is not necessary to say whether in any event a motion for a new trial may or may not be amended, it is sufficient for the purposes of this appeal to say, in the absence of a showing as to how this court may disregard the general rule, that the amended assignment was not timely filed and therefore may not be considered. State v. LaBreyere, 333 Mo. 1205, 64 S.W.2d 117; State v. Loyd, Mo., 233 S.W.2d 658; State v. Clark, Mo., 277 S.W.2d 593, 600.

The appellant was represented by court-appointed counsel, not only did they ably and vigorously represent and defend the appellant to the utmost, they have briefed his case and orally argued it in this court.

In addition to the briefed assignments of error, this court has considered "those matters upon the record before it." Sup.Ct. Rule 28.02. Therefore the judgment is affirmed.

BOHLING and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.

All concur.